No. 15-55287

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

### FLO & EDDIE, INC.,

*Plaintiff-Appellee*,

v.

### PANDORA MEDIA, INC.,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Central District of California
Case No. CV14-7648 PSG

_____

### BRIEF FOR APPELLANT

_____

James K. Lynch
Andrew M. Gass
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
jim.lynch@lw.com
andrew.gass@lw.com

Gregory G. Garre
   *Counsel of Record*
Jonathan Y. Ellis
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2007
Facsimile: (202) 637-2201
gregory.garre@lw.com
jonathan.ellis@lw.com

September 2, 2015

*Attorneys for Pandora Media, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Pandora Media, Inc., certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION.............................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF ADDENDUM ............................................................4

STATEMENT OF THE CASE...............................................................4

I.      FACTUAL AND LEGAL ALLEGATIONS .................................................4

II.     STATUTORY BACKGROUND ........................................................6

    A.      Federal Copyright Protection For Songs And Recordings...................6

    B.      State Copyright Protection For Unpublished Works ..........................13

        1.      California copyright:  1872 – 1981 ...........................................13

        2.      California copyright:  1982 – present .......................................19

III.    PROCEEDINGS BELOW ..........................................................22

SUMMARY OF ARGUMENT ...............................................................24

STANDARD OF REVIEW ..................................................................27

ARGUMENT ...............................................................................27

I.      ALL OF FLO & EDDIE'S CLAIMS MUST BE DISMISSED ..................28

    A.      Pandora's Broadcast Of The Sound Recordings At Issue Is Protected Activity Under The Anti-SLAPP Statute............................28

        1.      Pandora's broadcasts of pre-1972 sound recordings are in furtherance of its First Amendment rights................................29

**Page**

       2.    Pandora's broadcasts of pre-1972 sound recordings are connected to an issue of public interest ....................................30

    B.    Flo & Eddie Cannot Establish A Reasonable Probability That They Will Prevail On Their Claims ......................................................32

        1.    Flo & Eddie does not own any California copyrights in the sound recordings at issue ......................................................32

            (a)    Flo & Eddie's California copyrights expired when the Turtles sold their recordings ......................................32

            (b)    The 1982 amendment to California copyright law did not resurrect Flo & Eddie's copyrights. ..................34

        2.    California copyright law does not confer an exclusive right to publicly perform popular sound recordings ................41

        3.    Flo & Eddie's resort to non-copyright common law doctrines also is unavailing ......................................................50

II.    AT A MINIMUM, THE COURT SHOULD CERTIFY THE DISPOSITIVE CALIFORNIA LAW QUESTIONS TO THE CALIFORNIA SUPREME COURT ............................................................55

CONCLUSION ................................................................................................58

STATEMENT OF RELATED CASES ..................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Records, Inc. v. Heilman*,
142 Cal. Rptr. 390 (Ct. App. 1977) ............................................................51, 52

*Arista Records, LLC v. Launch Media, Inc.*,
578 F.3d 148 (2d Cir. 2009) ...................................................................53

*Bobbs-Merrill Co. v. Straus*,
210 U.S. 339 (1908)...............................................................................46

*Brodie v. Workers' Compensation Appeals Board*,
156 P.3d 1100 (Cal. 2007) .....................................................................39

*California State Restaurant Ass'n v. Witlow*,
129 Cal. Rptr. 824 (Ct. App. 1976) .......................................................31

*Capitol Records, Inc. v. Erickson*,
82 Cal. Rptr. 798 (Ct. App. 1969) ...............................................51, 52, 54

*Capitol Records, Inc. v. Mercury Records Corp.*,
221 F.2d 657 (2d Cir. 1955) ...................................................................19

*Capitol Records, LLC v. Bluebeat, Inc.*,
765 F. Supp. 2d 1198 (C.D. Cal. 2010) ................................................55

*Cartoon Network LP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ...................................................................49

*Chisom v. Roemer*,
501 U.S. 380 (1991).................................................................................39

*City of Cotati v. Cashman*,
29 Cal. 4th 69 (2002) ..............................................................................28

*Doe v. Gangland Products, Inc.*,
730 F.3d 946 (9th Cir. 2013) .......................................................28, 29, 30

*Elkins v. Superior Court*,
163 P.3d 160 (Cal. 2007)..................................................................40, 45

**Page(s)**

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   62 F. Supp. 3d 325, 340 (S.D.N.Y. 2014) ...........................................................2

*Flo & Eddie Inc. v. Sirius XM Radio Inc.*,
   No. CV 13-5693 PSG, 2014 WL 4725382 (C.D. Cal. Sept. 22,
   2014) ...................................................................................22, 23, 42, 44, 45

*Geertz v. Ausonio*,
   6 Cal. Rptr. 2d 318 (Ct. App. 1992) ................................................................44

*Golan v. Holder*,
   132 S. Ct. 873 (2012)................................................................................*passim*

*Green v. Bock Laundry Machine Co.*,
   490 U.S. 504 (1989)........................................................................................41

*Hall v. Time Warner, Inc.*,
   63 Cal. Rptr. 3d 798 (Ct. App. 2007) ..............................................................29

*Halstead v. Grinnan*,
   152 U.S. 412 (1894)........................................................................................49

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985)........................................................................................45

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ....................................................................29, 30

*International News Service v. Associated Press*,
   248 U.S. 215 (1918)........................................................................................52

*Kane v. Hurley*,
   35 Cal. Rptr. 2d 809 (Ct. App. 1994) ..............................................................35

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2013)....................................................................................46

*Kleffman v. Vonage Holdings Corp.*,
   551 F.3d 847 (9th Cir. 2008) ..........................................................................56

*Kremen v. Cohen*,
   325 F.3d 1035 (9th Cir. 2003) ........................................................................57

**Page(s)**

*Lehman Bros. v. Schein*,
    416 U.S. 386 (1974)..................................................................56

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
    740 F.2d 718 (9th Cir. 1984) ......................................1, 25, 33, 34, 52

*Makaeff v. Trump University, LLC*,
    715 F.3d 254 (9th Cir. 2013) ......................................3, 22, 27, 28, 32

*Marx v. General Revenue Corp.*,
    133 S. Ct. 1166 (2013)...............................................................44

*In re McLinn*,
    744 F.2d 677 (9th Cir. 1984) .......................................................56

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
    101 N.Y.S.2d 483 (Sup. Ct. 1950)................................................19

*Navellier v. Sletten*,
    52 P.3d 703 (Cal. 2002).........................................................29, 30

*No Doubt v. Activision Publishing, Inc.*,
    122 Cal. Rptr. 3d 397 (Ct. App. 2011) ...........................................30

*In re Pandora Media*,
    6 F. Supp. 3d 317, 332 (S.D.N.Y. 2014) ..........................................53

*Parfums Givenchy, Inc. v. Drug Emporium, Inc.*,
    38 F.3d 477 (9th Cir. 1994) .........................................................46

*Parsons v. Bedford*,
    28 U.S. (3 Pet.) 433 (1830)..........................................................45

*People v. Horn*,
    205 Cal. Rptr. 119 (Ct. App. 1984) ...........................................35, 38

*People v. Molina*,
    15 Cal. Rptr. 3d 493 (Ct. App. 2004) .........................................35, 38

*People v. Szarvas*,
    191 Cal. Rptr. 117 (Ct. App. 1983) ...............................................52

**Page(s)**

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................49

*Preferred Communications, Inc. v. City of Los Angeles*,
   754 F.2d 1396 (9th Cir. 1985), *aff'd*, 476 U.S. 488 (1986)................29

*RCA Manufacturing Co. v. Whiteman*,
   114 F.2d 86 (2d Cir. 1940) ................................................15, 16, 33

*Sears, Roebuck & Co. v. Stiffel Co.*,
   376 U.S. 225 (1964)............................................................................12

*Silverbrand v. County of Los Angeles*,
   205 P.3d 1047 (Cal. 2009) ................................................................44

*Stewart v. Rolling Stone LLC*,
   105 Cal. Rptr. 3d 98 (Ct. App. 2010) ........................................31, 32

*Tamkin v. CBS Broadcasting, Inc.*,
   122 Cal. Rptr. 3d 264 (Ct. App. 2011) ......................................29, 30

*Varian Medical Systems, Inc. v. Delfino*,
   106 P.3d 958 (Cal. 2005) ..................................................................27

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)............................................................................29

*Waring v. WDAS Broadcasting Station, Inc.*,
   194 A. 631 (Pa. 1937) ......................................................................15

## FEDERAL STATUTES AND RULES

17 U.S.C. § 101 ........................................................................................7

17 U.S.C. § 102(a) ..................................................................................20

17 U.S.C. § 106....................................................................................7, 43

17 U.S.C. § 106(6) ..................................................................................12

17 U.S.C. § 108 ......................................................................................46

17 U.S.C. § 110(1) ..................................................................................46

**Page(s)**

17 U.S.C. § 114 ...................................................................12, 48, 53

17 U.S.C. § 114(a) ............................................................................43

17 U.S.C. § 114(b) ............................................................................43

17 U.S.C. § 301 .................................................................................20

17 U.S.C. § 301(a) .........................................................................6, 12

17 U.S.C. § 301(b)(1) .......................................................................36

17 U.S.C. § 301(c) ....................................................................6, 11, 36

17 U.S.C. § 302(a) ..............................................................................7

28 U.S.C. § 1291 .................................................................................3

28 U.S.C. § 1332(d)(2) ........................................................................3

Copyright Act of 1790, ch. 15, 1 Stat. 124 ....................................13

Act of Feb. 3, 1831, ch. 16, 4 Stat. 436 ...........................................6

Act of Apr. 16, 1946, ch. 138, 60 Stat. 89 .....................................18

Act of July 30, 1947, ch. 391, 61 Stat. 656 ....................................13

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ...........................11

Act of Oct. 19, 1976, Pub. L. No. 94-553, 90 Stat. 2541 ................13, 43

Consolidate the Acts Respecting Copyright, ch. 320, 35 Stat. 1075
(Mar. 4, 1909) ............................................................................13, 14

Digital Performance Right in Sound Recordings Act of 1995, Pub. L.
No. 104-39, 109 Stat. 336 .............................................................12

Federal Rule of Appellate Procedure 4(a) ........................................4

viii

**Page(s)**

## STATE STATUTES AND RULES

Cal. Civ. Code § 980 (1874) ...................................................................14

Cal. Civ. Code § 980(a) (1949)........................................................35, 37

Cal. Civ. Code § 980(a)(1)...................................................................36

Cal. Civ. Code § 980(a)(2)....................................................21, 36, 41

Cal. Civ. Code § 981 (1874) ...................................................................43

Cal. Civ. Code § 983 (1874) ...................................................................14

Cal. Civ. Code § 983 (1947) ...................................................................18

Cal. Civ. Code § 983(a) (1949)........................................................33, 35

Cal. Civ. Proc. Code § 425.16 ............................................................4, 22

Cal. Civ. Proc. Code § 425.16(e)(4) ......................................................28

Cal. Civ. Proc. Code § 425.17(b)...........................................................31

Cal. Civ. Proc. Code § 425.17(d)(2) ......................................................31

Cal. Penal Code § 653h(a) ..............................................................48, 52

Cal. Penal Code § 653h(g) ....................................................................52

Cal. R. Ct. 8.548(a) ..............................................................................56

## LEGISLATIVE MATERIALS

H. Comm. on the Judiciary, *Prohibiting Piracy of Sound Recordings*,
    H.R. Rep. No. 92-487 (1971), *reprinted in* 1971 U.S.C.C.A.N.
    1566.......................................................................................11

H.R. 1270, 80th Cong. (1947)..................................................................8

H.R. 4347, 89th Cong. (1966)..................................................................8

H.R. 7173, 77th Cong. (1942)..................................................................8

ix

**Page(s)**

H.R. 10632, 74th Cong. (1936)..................................................................8

H.R. 11258, 68th Cong. (1925)..................................................................8

*Hearings Before the H. Comm. on Patents*, 72d Cong. (1932) ................................9

*Hearings Before the H. Comm. on Patents*, 74th Cong. (1936) ........................8, 51

*Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 89th Cong. (1965) ..........................................9, 10

*Hearings Before the Subcomm. on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary*, 80th Cong. (1947) ...............9, 10

*Hearings Before the Subcomm. on Patents, Trademarks, and Copyrights of the S. Comm. on the Judiciary*, 90th Cong. (1967) ............8, 9, 10

Staff of Subcommittee on Courts, Civil Liberties, & the Administration of Justice of the H. Comm. on the Judiciary, 95th Cong., *Performance Rights in Sound Recordings* (Comm. Print 1978) ...................................................................16

## OTHER AUTHORITIES

Howard B. Abrams, *Copyright, Misappropriation, and Preemption*, 1983 Sup. Ct. Rev. 509 ......................................................54

Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo. Wash. L. Rev. 152 (1974).........................................16, 53

John Maurice Clark, *Social Control of Business* (1939) .........................................42

R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960).........................42

Robert A. Gorman, *The Recording Musician and Union Power: A Case Study of the American Federation of Musicians*, 37 Sw. L.J. 697 (1983-1984)..................................................16, 17

Ken Hendricks & Alan Sorenson, *Information and Skewness of Music Sales*, 117 J. Pol. Econ. 324 (2009) ...................................................53

**Page(s)**

Allan Kozinn, *Rare Dylan Recordings Set for Release in Copyright-Extension Bid*, N.Y. Times, Dec. 5, 2014, http://artsbeat.blogs.nytimes.com/2014/12/05/rare-dylan-recordings-set-for-release-in-copyright-extension-bid/......................................37

William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & Econ. 265 (1987)...........................................42

Jon Lusk, *Hank Williams: The Unreleased Recordings Review*, BBC Review (2008), http://www.bbc.co.uk/music/reviews/vnxm ...........................37

James C. McKinley Jr., *Exhuming the Last of Hendrix's Studio Sessions*, N.Y. Times, Mar. 6, 2013 ...................................................37

Neil Weinstock Netanel, *First Amendment Constraints on Copyright after Golan v. Holder*, 60 UCLA L. Rev. 1082 (2013) ......................................45

Nielsen, *Study: Radio Airplay and Music Sales* (2013), http://www.nab.org/documents/newRoom/pdfs/Nielsen_Airplay_Sales_Study.pdf..............................................53

Melville B. Nimmer, *Copyright Publication*, 56 Colum. L. Rev. 185 (1956)............................................................................................33

Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Law Blog (Oct. 1, 2014), http://blog.ericgoldman.org/archives/2014/10/a-seismic-ruling-on-pre-1972-sound-recordings-and-state-copyright-law-flo-eddie-v-sirius-xm-radio-guest-blog-post.htm......................................57

Richard A. Posner, *Economic Analysis of Law* (8th ed. 2011)................................42

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012).......................................45

U.S. Copyright Office, Study No. 26: *The Unauthorized Duplication of Sound Recordings* (1961) ............................................................16, 17, 18, 51

U.S. Copyright Office, Study No. 29: *Protection of Unpublished Works* (1961)..................................................................................13, 14

Geoffrey C. Ward, *Jazz: A History Of America's Music* (2012).............................17

## INTRODUCTION

Plaintiff-Appellee Flo & Eddie, Inc. ("Flo & Eddie") claims damages under California law from Defendant-Appellant Pandora Media, Inc. ("Pandora") for Pandora's broadcast of sound recordings by the popular 1960s band the Turtles, which were first published in the 1960s when the Turtles sold the albums containing those recordings.  Copyright protection for sound recordings made before 1972 is generally a matter of state rather than federal law.  As this Court has recognized, it was historically settled that a "pre-1972" sound recording lost its California copyright protection when it was "published," *i.e.*, distributed in commerce with the rightsholder's permission.  *See Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725-26 (9th Cir. 1984).  The central question in this case is whether a 1982 house-keeping amendment to the California copyright statute not only overrode the century-old divestiture-by-publication rule recognized by this Court in *Lone Ranger*, but actually *resurrected* state copyright protection for all sound recordings made before 1972 that had already been published—creating hundreds of millions, if not billions, of dollars in potential new royalties.

The answer is no.  Neither the text nor the history of the 1982 amendment supports the conclusion that the California legislature intended to resurrect protection for pre-1972 sound recordings, like those at issue here, that already had

1

been published and thus had lost their state copyright protection. To the contrary, the legislative history of the 1982 amendment shows that the California legislature simply intended to "*maintain* rights and remedies in sound recordings fixed prior to February 15, 1972." ER30 (emphasis added). And holding that the 1982 amendment resurrected previously lapsed copyrights would not only create an unworkable intellectual property regime (*e.g.*, Who, precisely, would own these zombie copyrights—the artists, the record label, both, or as alleged here, neither?), but would also raise serious constitutional concerns by disrupting Fifth Amendment-protected reliance interests. *See Golan v. Holder,* 132 S. Ct. 873, 882-83 (2012).

None of this should come as a surprise. Radio stations have always paid royalties for broadcasting *songs* (*i.e.*, the musical composition performed) and have never paid royalties for broadcasting *sound recordings* (*i.e.*, the rendition of that work captured on tape). *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325, 340 (S.D.N.Y. 2014) ("[N]ot paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century."). The reason is that the law has always required the former and never required the latter. That is why "performing rights organizations" like ASCAP and BMI formed in the first half of the 20th century to collect and distribute license payments for the public performance of musical compositions,

2

while no parallel institutions developed for sound recordings. It is why the record labels themselves spent decades lobbying Congress specifically to *create* federal copyright protection that would require royalties for the radio broadcast of sound recordings. It is why the American Federation of Musicians famously launched a strike lasting more than two years during World War II, curtailing the recorded repertoires of jazz greats such as Charlie Parker at a critical juncture in American music, expressly (though unsuccessfully) to try to force radio stations to pay the same fees.

In short, nearly a century's worth of real-world history, legislative wrangling, and rancorous public policy debate were all premised on the universal understanding that the legal right asserted in this lawsuit—a duty for radio stations to pay royalties not just for musical compositions but also for sound recordings— does not exist. Neither the 1982 amendment nor the common law doctrines of misappropriation, unfair competition, and conversion, on which the district court also relied, change that. The district court's decision should be reversed.

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction under 28 U.S.C. § 1332(d)(2). This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). On February 23, 2015, the court denied Pandora's motion to strike all claims under California's

"anti-SLAPP" statute (Cal. Civ. Proc. Code § 425.16). ER1-14. On February 24, 2015, Pandora filed a timely notice of appeal. ER15; *see* Fed. R. App. P. 4(a).

## STATEMENT OF THE ISSUES

1. Whether broadcasting popular sound recordings to the public constitutes "protected activity" under California's anti-SLAPP law.

2. Whether broadcasting popular sound recordings made before 1972 requires royalties that no court has ever previously recognized and record labels have never previously collected, under a California state copyright regime historically limited to protecting only *un*published sound recordings.

## STATEMENT OF ADDENDUM

The full text of the relevant statutory provisions is set forth in the statutory addendum filed concurrently with this brief. *See* 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

## I. FACTUAL AND LEGAL ALLEGATIONS[1]

Pandora "is one of the leading operators of an internet radio service in the United States." ER156 ¶ 1. It provides "a personalized music experience" for 200 million people, "wherever and whenever they want to listen to radio on a wide range of smart phones, tablets, traditional computers, car audio systems and a

---

[1] Pandora's anti-SLAPP motion was in the nature of a Federal Rule of Civil Procedure 12(b)(6) motion; it accepted all facts alleged in the Complaint as true, and mounted only legal (not factual) defenses.

4

range of other internet-connected devices." *Id*. Pandora generally obtains copyright licenses to deliver music to its users, when required by law—including licenses for the "musical works" (*i.e.*, songs) embodied in all recordings, irrespective of when they were made. *Id*. ¶ 2. Pandora does not, however, take an additional license specifically for the sound recordings themselves, when, as here, the recordings were made before 1972. *Id*.

Flo & Eddie is a California corporation owned by Howard Kaylan and Mark Volman, two founding members of the 1960s band the Turtles. ER157 ¶¶ 6-7. Flo & Eddie purports to own California state-law copyrights in a number of sound recordings made by the Turtles during the 1960s. *Id*. ¶ 8. It has filed this putative class action against Pandora on behalf of "[a]ll owners of sound recordings of musical performances that initially were 'fixed' (*i.e.*, recorded) prior to February 15, 1972, which sound recordings were reproduced, performed, distributed and/or otherwise exploited by Pandora ... in California." ER160-61 ¶ 22.

The crux of Flo & Eddie's complaint is that Pandora streams recordings made before 1972 to the public (*i.e.*, publicly performs them) and that, in order to do so, Pandora has "reproduced and copied and continues to reproduce and copy pre-1972 sound recordings." ER158-59 ¶¶ 16-17. This conduct, Flo & Eddie claims, gives rise to four causes of action under California state law—one under Civil Code § 980(a)(2) (part of the state copyright statute) (ER163-64 ¶¶ 29-34),

and three more under the common law doctrines of misappropriation (ER164-65 ¶¶ 35-43), unfair competition (ER165-67 ¶¶ 44-51), and conversion (ER167-68 ¶¶ 52-58). Flo & Eddie seeks at least $25 million in damages for past royalties allegedly owed on behalf of the class, along with various forms of equitable relief, including "a temporary, preliminary, and permanent injunction" preventing Pandora from playing any recordings made before 1972. ER168-69 ¶¶ B, C, D, E.

## II.   STATUTORY BACKGROUND

By and large, copyright protection in the United States is the province of federal law. *See* 17 U.S.C. § 301(a) (preempting "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of [federal] copyright"). But Congress has carved out limited categories in which states can choose whether and to what extent to protect particular types of works. By virtue of a lengthy history, summarized in relevant part below, "sound recordings" made before February 15, 1972, are one such category. *Id.* § 301(c).

### A.   Federal Copyright Protection For Songs And Recordings

1. Federal copyright law has always treated songs differently from *recordings* of songs. Songs (also known as "musical compositions" or "musical works") are the actual notes and lyrics written by the composer and author. Since 1831, songs have enjoyed federal copyright protection. *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. Regardless of the outcome of this case, it is indisputably

copyright infringement under federal law for someone to take a song protected by one of these copyrights and reproduce, distribute, or publicly perform it without a license. *See* 17 U.S.C. § 106. "Performing rights societies" like ASCAP, BMI, and SESAC exist for the purpose of collecting license fees from companies like Pandora to pay to the rightsholders of these works every time a song is publicly performed, over the radio or otherwise. *See id.* § 101 (defining "performing rights society"). These federal "musical work" copyrights apply to songs recorded before 1972 no less than songs recorded today, and last as long as the life of the author plus seventy years. *See id.* § 302(a). None is at issue in this case; there is no allegation that Pandora failed to pay any required "musical work" royalties.

Historically, federal copyright did not, however, provide separate protection for a sound recording that captured a particular rendition of a musical work. To be sure, playing a recorded song over the radio or selling an album featuring the recorded song required a license from the holder of the copyright in the composition itself (*i.e.*, the notes and lyrics), and the resulting royalties could be allocated as the rightsholder saw fit. But in practice, the rightsholder in the composition was the songwriter or the publisher, and they rarely if ever shared those payments with the record labels or the artists who actually performed the song later broadcast over the radio (except, of course, when the songwriter was also the performer).

2. Dissatisfied with the legal regime that yielded this divergent treatment, the record labels and musicians went to Capitol Hill. Between 1925 and 1971, dozens of bills were introduced in Congress that would have granted some form of independent copyright protection to sound recordings that vested not in songwriters and publishers, but in performing artists or record companies.[2] Those bills had the support of performing artists including renowned orchestra conductor Paul Whiteman, who testified that: "[o]ne of the most flagrant evils in our profession today is the use of phonograph records … by broadcasters." *Hearings Before the H. Comm. on Patents*, 74th Cong. 679 (1936) ("*1936 Hearings*"). "No permission is required from the artist and no compensation is given him," he explained. *Id.* Without congressional intervention, conductor Josef Pasternak added, performing artists "[we]re rendered helpless and [we]re unable to cope with this vicious and constant repetition" made possible by the advent of recorded performances, which had impacted the demand for live orchestras. *Id.* at 680.[3]

---

[2]  *See, e.g.*, H.R. 11258, 68th Cong. (1925); H.R. 10632, 74th Cong. (1936); H.R. 7173, 77th Cong. (1942); H.R. 1270, 80th Cong. (1947); H.R. 4347, 89th Cong. (1966).

[3]  *See also id.* at 658 ("We should be permitted to participate in the fruit of our efforts, and no person should be able to profit by our efforts unless we shall be entitled to a share of such profit."); *Hearings Before the Subcomm. on Patents, Trademarks, and Copyrights of the S. Comm. on the Judiciary*, 90th Cong., pt. 4, 1076 (1967) ("*1967 Hearings*") ("Our petition besp[eaks] the aspirations of all American performers—the aspiration which, for more than three decades, have been voiced in vain by actors and singers, as well as by instrumental musicians …

The recording industry echoed these concerns. Their phonograph records "were performed constantly on the radio," yet they received no compensation. *Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 89th Cong., pt. 2, 951 (1965) ("*1965 Hearings*"). "This free use of our product for the profit of others," they maintained, "[wa]s not in the spirit of the Copyright Act." *Id.* "It must shock one's conscience that the playing of the delayed performance of a phonograph recording artist ... results in no compensation to the person who made that phonograph record." *1967 Hearings*, 90th Cong., pt. 2, 498.[4]

Opposition to these efforts, however, was equally fierce. Broadcasters balked at the idea of paying royalties to performers for every "spin" of a sound recording, above and beyond the royalties they owed to the composers on the same "spin" for playing the underlying musical composition. *See Hearings Before the H. Comm. on Patents*, 72d Cong. 193 (1932) ("This would be very prejudicial to the

---

but thus far denied in practice principally by reason of historic, rigid, unyielding opposition of free-riding users and jealous music publishers and public performance societies.").

[4]  *See also id.* at 496 ("The record company receives nothing from the widespread performance-for-profit of its products, whether on radio or television, in clubs or restaurants."); *Hearings Before the Subcomm. on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary*, 80th Cong. 56 (1947) ("*1947 Hearings*") ("The composer is protected in [the] recording .... The radio station will collect for the time used on air. However, the record manufacturer who may have spent thousands of dollars for that recording will get nothing except the retail price of that record. Of course, you know that attempts have been made to correct the abuse through litigation, and they have not been successful.").

smaller broadcasting stations ....").  They argued that penalizing radio stations for broadcasting sound recordings would be unfair, since broadcasting "inures to the benefit of the record manufacturer, the performer, and the songwriter" by giving records "the widest possible exposure." *1967 Hearings*, 90th Cong., pt. 3, 865.[5] Meanwhile, songwriters and composers complained that granting record labels or performers a copyright in sound recordings would unfairly diminish the utility of *their* rights in the underlying musical work: "I create a song; that is mine.  I don't want Fred [Waring], and I don't want every interpretative artist from the little hoity-toity saloon getting a copyright on the creations of my brain and utilize it and stop, through their copyright, the freedom that my works are entitled to under the 'exclusive' right." *1947 Hearings*, 80th Cong. 19.[6]

So the battle raged.  And for nearly 50 years, the efforts to secure federal copyright protection for sound recordings failed in Congress, again and again.

---

[5] *See also id.* at 1086 (pt. 4) ("[Performing artists already] get paid twice.  They get paid one … when they enter into contract for their services to the recording company, and secondly, they get paid again on a contract basis a certain amount each time a record is sold."); *1965 Hearings*, 89th Cong., pt. 3, 1721 ("We find it extremely difficult to determine what is intellectually created by a record manufacturer in providing the technical know-how to the recording of the creative work of a composer.").

[6] *See also id.* at 26 ("It was never intended in England or the United States, that interpreters should have that sacred [copy]right, because what do they add to human knowledge?  They simply interpret, they simply lend their emotions and they color something which was created by someone else."); *1967 Hearings*, 90th Cong., pt. 3, 880 ("We ask only that the copyright law not contradict the intent of the Constitution and destroy [our] fundamental right.").

3. Finally, a compromise was reached. Federal copyright protection was extended to sound recordings for the first time in the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ("1971 Act"). But that protection came with two significant limitations: First, to address the broadcasters' concerns, the 1971 Act provided that a sound recording copyright, unlike a musical work copyright, did not grant the owner an exclusive right of "public performance," *see* 85 Stat. at 391; instead, it focused on preventing record piracy—*i.e.*, the "reproduction and distribution of recorded performances" by "unauthorized manufacturers." H. Comm. on the Judiciary, *Prohibiting Piracy of Sound Recordings*, H.R. Rep. No. 92-487, at 4 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1566, 1569. So playing a sound recording over the radio still required only *one* license (for the musical work). *See id.* at 8, 1971 U.S.C.C.A.N. at 1573. Second, to address the reliance interests of those utilizing existing sound recordings, the 1971 Act provided that even these limited new rights applied only to sound recordings "fixed"—*i.e.*, made—after the Act went into effect, on February 15, 1972. 17 U.S.C. § 301(c).

Notably, there was no outcry at the time by record labels or anyone else complaining that Congress had diminished the protection then accorded sound recordings under state law (including under the law of a state as prominent to the recording industry as California)—despite recent Supreme Court precedent suggesting that the extension of federal copyright protection would preempt (and

11

extinguish) any existing state-law protection. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964) (Federal patent and copyright laws, "like other laws of the United States enacted pursuant to constitutional authority, are the supreme law of the land. When state law touches upon the area of these federal statutes, it is 'familiar doctrine' that the federal policy 'may not be set at naught, or its benefits denied' by the state law." (citations omitted)). And nary a peep when, five years later, Congress made that preemption explicit. *See* 17 U.S.C. § 301(a).

This remained the state of the law until 1995, when Congress broadened the legal protection for sound recordings first created in the 1971 Act, granting them a limited form of "public performance" right for the first time. *See* Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336. But even then, Congress provided only the exclusive right to publicly perform a sound recording via digital transmission. 17 U.S.C. § 106(6). And Congress created a compulsory license regime for companies, like Pandora, who sought to engage in such digital public performances. *See id.* § 114. That law, as amended, remains in effect today. So for sound recordings protected by federal copyrights, there is (and has always been) no royalty obligation for over-the-air radio plays or in-person public performances, but there is (after the 1995 amendment) one for public performances carried out over a digital medium.

**B.      State Copyright Protection For Unpublished Works**

Beginning with the first U.S. copyright law adopted by the First Congress in 1790, federal statutory copyright protection was historically available principally for *published* works.   *See* Copyright Act of 1790, ch. 15 § 2, 1 Stat. 124 (conditioning copyright on the "publishing" of a map, chart, or book).  This was the rule for most of the 20th century, including the period during which the songs at issue here were recorded, *see* Act to Amend and Consolidate the Acts Respecting Copyright, ch. 320, § 9, 35 Stat. 1075, 1077 (Mar. 4, 1909) ("1909 Act"); Act of July 30, 1947, ch. 391, 61 Stat. 656, until federal protection was extended to all unpublished works for the first time in 1976, *see* Act of Oct. 19, 1976, Pub. L. No. 94-553, § 101, 90 Stat. 2541, 2544-45 ("1976 Act").   In the absence of any federal statutory protection for most unpublished works before the 1976 Act, courts recognized a "common law" copyright in unpublished works, and some states codified those rights in statutes.  *See generally* U.S. Copyright Office, Study No. 29: *Protection of Unpublished Works* (1961) ("U.S. Copyright Office Study No. 29").

**1.      California copyright:  1872 – 1981**

a. California is one of the states that has always addressed this subject by statute.  In 1872, the legislature adopted Civil Code § 980, which provided:

> The author of any product of the mind, whether it is an invention, or a composition in letters or art … has an

13

> exclusive ownership therein, and in the representation or
> expression thereof.

Cal. Civ. Code § 980 (1874). At the same time, however, the legislature limited

that protection to the period before a work was "public":

> If the owner of a product of the mind intentionally makes
> it public, a copy or reproduction may be made public by
> any person, without responsibility to the owner, so far as
> the law of this State is concerned.

Cal. Civ. Code § 983 (1874). This statutory scheme mirrored the judicial treatment

of "common law" copyrights, which universally held that the "publication" of a

work divested any common law protection. *See* U.S. Copyright Office Study No.

29, at 1 ("It is the accepted rule of law that the property right which the author has

under the common law is terminated by publication of the work.").

For some works, publication thus marked a transition from state copyright

protection to federal protection—provided the author abided by the various formal

requirements in that era for procuring a federal copyright, like depositing a copy

with the Copyright Office and including the copyright symbol "©" on published

copies. *See* 1909 Act, ch. 320 §§ 9, 12, 35 Stat. at 1077, 1078. As discussed,

however, when sound recordings started gaining commercial traction in the early

20th century, they were not subject to federal copyright protection at all. *See supra*

at 7. So it became important for performing artists, recording companies, and

broadcasters to know precisely what it meant for a record to be "published" (under

14

the common law) or "ma[de] public" (under the 1872 California statute). For sound recordings, rather than marking a transition from state to federal copyright protection, that event—publication—would extinguish copyright protection altogether.

b. Courts in other states were the first to consider whether publication divested *sound recordings* of copyright protection, just as it did other types of works. In *Waring v. WDAS Broadcasting Co.*, the Supreme Court of Pennsylvania recognized that "according to general American doctrine" publication typically terminated any common law property rights. 194 A. 631, 635-36 (Pa. 1937). But it nevertheless held that, if a record producer labeled the albums it sold as "Not licensed for Radio Broadcast," that restriction could be enforced in equity by the performer of the sound recordings contained on the album. *See id.* at 638.

A few years later, in an opinion written by Judge Learned Hand, the Second Circuit disagreed. *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). In *Whiteman*, RCA filed suit to enjoin "the broadcasting of phonograph records of musical performances" by Paul Whiteman's orchestra over the radio. *Id.* at 87. As in *Waring*, the record producer had attempted to secure royalties for radio plays of sound recordings by putting a legend on its records saying that they were "Only For Non-Commercial Use on Phonographs in Homes." *Id.* But the Second Circuit rejected the ploy. Following the "general American doctrine," the

15

court held that "the 'common-law' property in the[] performances ended with the sale of the records." *Id.* at 89. The restriction fixed on the records "did not save" the copyright in the sound recordings. *Id.* And that being so, "the records themselves could not be clogged with a servitude." *Id.*

*Whiteman* was quickly recognized as establishing the general rule, *see* U.S. Copyright Office, Study No. 26: *The Unauthorized Duplication of Sound Recordings*, at 15 (1961) ("U.S. Copyright Office Study No. 26"), "both because it was expressed in a most thoughtful opinion by the most highly regarded jurist of his day, Learned Hand, and because the Second Circuit encompassed New York, a center for record production and sales and for radio broadcasting." Robert A. Gorman, *The Recording Musician and Union Power: A Case Study of the American Federation of Musicians*, 37 Sw. L.J. 697, 704 (1983-1984). [7] And the practical consequences of the ruling were not lost on the public; it was widely appreciated that the decision "opened the door for the unrestricted, unauthorized, and unrecompensed use of phonograph records on radio stations." Staff of Subcommittee on Courts, Civil Liberties, & the Admin. of Justice of the H. Comm.

---

[7] Indeed, "while *Waring* presumably still represents the law in Pennsylvania, there have been no attempts in any state to use the authority of that decision to collect performance right fees for recordings." *See* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo. Wash. L. Rev. 152, 155-56 (1974).

on the Judiciary, 95th Cong., *Performance Rights in Sound Recordings* 654 (Comm. Print 1978).

In the wake of *Whiteman*'s express rejection of royalties for the radio broadcast of sound recordings, performing artists adopted a two-pronged strategy to advocate for the creation of those rights. First, they ramped up their efforts in Congress to change the law, spurring the introduction of six new bills from 1942-1951 that would have granted federal copyright protection for sound recordings, including an exclusive right of "public performance." *See* U.S. Copyright Office Study No. 26, at 34-37. Second, they turned to their union, the American Federation of Musicians, to advance the cause. Under the leadership of its president James C. Petrillo, the Federation organized a nationwide recording strike and demanded to be paid every time "their music was played in jukeboxes or on the radio." Geoffrey C. Ward, *Jazz: A History of America's Music* 310 (2012).

The resulting labor stoppage lasted 27 long months and, in the end, was a mixed success. By November 1944, every major recording company had agreed to pay royalties to the union for each record *sold*; but recording artists continued not to be paid for radio "spins." *See* Gorman*, supra*, at 705-09. And even that limited achievement came at a significant cost. As noted above, the performers' efforts to secure federal copyright protection failed in Congress. That was in no small part

17

due to Congress's fear of further empowering the strong arm tactics of Petrillo and his Federation. *See* U.S. Copyright Office Study No. 26, at 37.

Shortly thereafter, in fact, the legislative pendulum swung in the opposite direction: the radio and television industry persuaded Congress to make it a *federal crime* to attempt to use labor strikes to restrict the use of records in broadcasting. *See* Act of Apr. 16, 1946, ch. 138, 60 Stat. 89.

c. So matters stood, in mid-1947, when California first revised Civil Code § 983. The new version of that provision, which remained in effect throughout the period when the sound recordings at issue in this case were made, provided:

> If the owner of a composition in letters or art *publishes it* the same may be used in any manner by any person, without responsibility to the owner insofar as the law of this State is concerned.

Cal. Civ. Code § 983 (1947) (emphasis added). The legislative history of the 1947 revision makes clear that its purpose was to "bring the California statute into accord with federal law and judicial precedent within and without California." *See* ER113. That is why the legislature substituted the phrase "publishes it"—tracking the common law concept of "publication"—for the slightly distinct phrase "makes it public" in the old version of the law.

As the legislation's sponsor explained, "[o]ur courts have [in practice] construed the [1872 version of the] California statutes in accord with judicial precedent throughout the United States." ER125. The revision updated the statute

to reflect that practice, confirming that the California "copyright divestiture" doctrine was to follow the widely accepted common law of "publication," as it stood in 1947. Any sound recording in that era lost its California copyright protection when it was published, *e.g.*, when the album on which the recording appeared was sold to the public.

In 1955, nearly a decade after California amended section 983, the Second Circuit overruled *Whiteman*, concluding that it had misconstrued New York law. *See Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955). The panel held that a 1950 decision by a New York trial court suggested that as a matter of New York (non-statutory) common law, the rights to copy and sell sound recordings survived the works' authorized dissemination in commerce. *Id.* at 663 (citing *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (Sup. Ct. 1950)). But in California (and elsewhere), *Whiteman* had already had its impact; and in practice, neither record labels nor performers asserted royalties for the radio broadcast of sound recordings at all.

### 2. California copyright: 1982 – present

After the 1947 amendment to section 983, copyright law in California remained unchanged for the next 35 years. In 1982, the state legislature simultaneously amended both Civil Code § 980 (which had granted a California copyright to "[t]he author or proprietor of any composition in letters or art" in the

first instance) and § 983 (which divested that right upon publication). The 1982 revision was a clean-up bill, designed to "repeal existing provisions of state copyright law which ha[d] become obsolete in view of the preemption thereof by the Federal Copyright Act of 1976." *See* ER61.

The 1976 Act had made federal law newly applicable to any works "fixed in any tangible medium of expression," regardless of whether they were published or unpublished. 17 U.S.C. § 102(a). And it contained a sweeping preemption clause that expressly overrode the ability of states like California to provide the protection they had historically accorded *un*published works. *Id.* § 301. The California legislature thus undertook to "repeal those [California] statutes preempted by federal law," and replace them with narrower provisions governing the modest subject matters still eligible for state copyright protection. ER39; *see* ER63 ("This bill makes technical and minor policy changes in the State copyright laws in order to conform with Federal laws.").

One of those replacements was a new section 980(a), which in clause (2) addressed sound recordings made before 1972. That provision, the legislative digest explained, was intended to do nothing more than "*maintain* rights and remedies in sound recordings fixed prior to February 15, 1972." *See* ER30 (emphasis added). The text provided, in full:

> The author of an original work of authorship consisting of a sound recording initially fixed prior to February 15,

20

> 1972, has an exclusive ownership therein until February 15, 2047, as against all persons except one who independently makes or duplicates another sound recording that does not directly or indirectly recapture the actual sounds fixed in such prior sound recording, but consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate the sounds contained in the prior sound recording.

Cal. Civ. Code § 980(a)(2).

At the same time, the 1982 statutory revision deleted the prior version of section 983, which had always "terminat[ed] common law copyright upon publication of the work." *See* ER70. This amendment was necessary, the State Bar explained, because the new federal copyright law "abolish[ed] a former distinction between state protection for unpublished works and federal protection for published works." ER71. Going forward, no new *un*published works could be eligible for state law copyright protection at all—because federal law, to the exclusion of state law, would cover those works no less than published ones. So it was pointless to leave a statutory provision on the books *extinguishing* state protection upon publication.

Significantly, there was "no known opposition to the bill." ER66. That resounding silence stands in stark contrast to the decades of rancorous public policy debate and legislative wrangling over whether to establish federal copyrights for sound recordings in general, and a "public performance" right that would require royalties for radio broadcasts of sound recordings in particular.

21

## III.   PROCEEDINGS BELOW

Flo & Eddie sued Pandora on October 2, 2014—the week after winning partial summary judgment in an effectively identical case against satellite radio broadcaster Sirius XM Radio, Inc.—and the case was assigned to the same judge handling the *Sirius* case.  *See Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693 PSG, 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014).  Pandora, unlike Sirius, then filed an anti-SLAPP motion to strike all of Flo & Eddie's claims, on December 19, 2014.[8]  The district court denied it several hours after the hearing on the motion, on February 23, 2015.  ER14; *see* ER179.  The district court agreed with Pandora that Flo & Eddie's claims arise from Pandora's exercise of First Amendment rights—so that Pandora was entitled to invoke the protection of the anti-SLAPP statute—but the court denied Pandora's motion because it disagreed with Pandora that the claims are meritless as a matter of law.  ER14.

In *Sirius*, the district court ruled that the phrase "exclusive ownership" in Civil Code § 980(a)(2) confers "all rights that can attach to intellectual property," save the singular enumerated exception for making "cover" recordings.  *Sirius*, 2014 WL 4725382, at *5.  In the briefing leading to that decision, neither party explained that the status quo at the time of the 1982 revision of section 980(a)(2)

---

[8]   California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, establishes a special motion to strike meritless legal claims that arise from the exercise of First Amendment rights.  Defendants are permitted to file anti-SLAPP motions in federal court cases governed by California law.  *See Makaeff*, 715 F.3d at 261.

was that state law copyright protection terminated upon the publication of a sound recording. In fact, neither party referenced the existence of the statutory provision effecting that result, Civil Code § 983.

Accordingly, while the court concluded in *Sirius* that the 1982 revision of section 980(a)(2) was meant to do nothing more than maintain the status quo, the court had a fundamentally misguided conception of what the status quo actually was in 1982. The court wrote:

> [T]here is no pre-1982 (or post-1982) body of California common law *denying* sound recording owners the exclusive right to publicly perform their recordings. Sirius XM cannot point to a single case in which a judge considered facts implicating this right or even theorized on the right then decided that the right of public performance does not attach to ownership of sound recordings in California.

*Sirius*, 2014 WL 4725382, at *6 (emphasis added).

Pandora corrected this misunderstanding in its anti-SLAPP motion. Among other things, Pandora pointed to this Court's *Lone Ranger* decision, which held that, under California law as it stood before 1982, previously published sound recordings enjoyed *no* California copyright protection at all. In response, the district court reaffirmed the premise that the 1982 revision of section 980(a)(2) was intended to preserve the law as it existed, rather than create new rights. ER12-13. But rather than reversing course, the court stuck with the statutory interpretation it had embraced in *Sirius*. ER13.

23

The court attempted to square that circle by turning to non-copyright common law doctrines. According to the court, the divestive publication of sound recordings recognized by this Court in *Lone Ranger* had no practical effect at all in light of overlapping laws like misappropriation, unfair competition, and conversion—which, the court posited, replicated for published works the full suite of state law rights that were terminated by publication under copyright law (*i.e.*, section 983). *Id.* As the court put it: "[t]he 'publication' repeal was a non-event, because sound recording owners already enjoyed post-publication protection in California" under the common law doctrines of misappropriation, unfair competition, and conversion. *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

The district court held that, unbeknownst to virtually everyone, record labels have always been entitled under California copyright law to royalties for the performance of sound recordings made before 1972, including radio broadcasts, even when, as here, the recordings had been published. That far-reaching ruling is fundamentally mistaken and should be reversed by this Court.

It is beyond dispute that, from 1872 until 1982, the California state copyright statute afforded protection only to *un*published works. That principle was codified in California Civil Code § 983. And this Court has held that section 983 applied to

24

pre-1972 sound recordings no less than any other work subject to California state copyright law. *See Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725-26 (9th Cir. 1984). So when the sound recordings at issue in this case—popular songs recorded by the 1960s band the Turtles—were published via their authorized sale before 1982, they lost their protection under state law.

The district court erred in holding that the 1982 amendment to sections 980 and 983 somehow resurrected the copyright protection that the recordings at issue had already lost. Far from ushering in a landmark change in state copyright law— which would have imposed billions of dollars in new royalties on broadcasters for sound recordings that had already entered the public domain under preexisting California law—the 1982 revision simply made "technical and minor policy changes in State copyright laws in order to conform with Federal laws." *See* ER63. And underscoring the law's limited objective, there was no known opposition to the 1982 amendment. The district court's conclusion that the 1982 amendment revolutionized copyright protection for sound recordings not only defies common sense, but also raises significant constitutional concerns because it would fundamentally disrupt settled expectations concerning the right to use sound recordings that had long since entered the public domain under the pre-1982 regime. *Cf. Golan v. Holder*, 132 S. Ct. 873, 882-83 (2012).

The district court also erred in turning to non-copyright common law doctrines to create shadow "copy" rights that did not exist under state copyright law. The non-copyright doctrines of misappropriation, unfair competition, and conversion neither independently make it illegal to broadcast previously published sound recordings without paying royalties, nor effectively replicate the full suite of rights historically accorded unpublished works under state copyright law. These common law doctrines have been around since the invention of radio broadcasting, and yet no California court has ever held that they proscribe the broadcasting of a sound recording. To the contrary, with narrow exceptions not applicable here, the California courts, like other courts, have rejected resort to non-copyright doctrines—specifically including misappropriation, unfair competition, and conversion—to create copyright-like protections. That is exactly what the district court did below. Once it is accepted that Pandora's broadcast of the recordings at issue did not violate any state copyright right, it follows that Flo & Eddie's non-copyright common law claims must be rejected as well.

The rejection of Flo & Eddie's extraordinary claim for royalties for Pandora's broadcast of sound recordings in widespread use for more than four decades follows from a straightforward interpretation of California law and existing precedent. But to the extent this Court has any doubt about the proper construction of California law, it should certify these legal issues to the California

26

Supreme Court. This case involves substantial issues of state law, and the impact of the decision below will be broad and disruptive effects if allowed to stand. At a minimum, before this action is allowed to proceed, the California Supreme Court should have an opportunity to opine on these dispositive state law issues.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's determination of a motion to strike under California's anti-SLAPP statute." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

## ARGUMENT

California's anti-SLAPP statute was enacted to facilitate swift disposition of meritless lawsuits just like this one that impede the exercise of First Amendment rights. *See Varian Med. Sys., Inc. v. Delfino*, 106 P.3d 958, 966 (Cal. 2005). Resolution of an anti-SLAPP motion proceeds in two steps. First, the defendant must show that the plaintiff's suit arises from First Amendment-protected activity. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). Second, if the defendant shows that the plaintiff's claims do target such "protected activity," "[t]he burden then shifts to the plaintiff … to establish a reasonable probability that it will prevail on its claim." *Id.* at 261-62. If the plaintiff fails to make that showing, the court must strike the plaintiff's offending claims. *See id.* at 261.

Flo & Eddie's claims specifically target Pandora's exercise of its First Amendment rights to broadcast music to millions of Americans. That is undoubtedly "protected activity" within the meaning of the anti-SLAPP statute. *See* ER3-6. To prevent the dismissal of its claims, Flo & Eddie therefore must demonstrate "a probability of prevailing" on each of them. *City of Cotati v. Cashman*, 29 Cal. 4th 69, 76 (2002); *see also Makaeff*, 715 F.3d at 261. It cannot do so, because the rights it asserts under California law do not exist. If the Court has any doubt about that, it should at least certify the state law issues to the California Supreme Court before allowing this action to proceed.

## I.  ALL OF FLO & EDDIE'S CLAIMS MUST BE DISMISSED

### A.  Pandora's Broadcast Of The Sound Recordings At Issue Is Protected Activity Under The Anti-SLAPP Statute

The anti-SLAPP statute extends to suits asserting liability from "any … conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e)(4). This Court has interpreted that catch-all category to require a two-part showing that the defendant engaged in conduct "(1) in furtherance of the right of free speech, and (2) in connection with an issue of public interest." *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013). Pandora's broadcasts of the sound recordings at issue easily satisfy both criteria, as the district court properly held. ER6.

28

### 1. Pandora's broadcasts of pre-1972 sound recordings are in furtherance of its First Amendment rights

Pandora's broadcasting activities are "in furtherance of the right of free speech." Both this Court and California's courts "have interpreted this piece of the defendant's threshold showing rather loosely." *Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (9th Cir. 2010). The defendant need not "establish her actions are constitutionally protected under the First Amendment as a matter of law." *Navellier v. Sletten*, 52 P.3d 703, 713 (Cal. 2002). It is enough that "the defendant's activity is communicative." *Hilton*, 599 F.3d at 904.

Pandora's streaming of Flo & Eddie's pre-1972 sound recordings meets this low threshold. Playing "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). And "First Amendment protection is not diminished because [Pandora] distribute[s] or present[s] works created by others." *Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1410 n.10 (9th Cir. 1985), *aff'd*, 476 U.S. 488 (1986). This Court and others have long recognized that broadcasting activities are covered by the anti-SLAPP statute. *Gangland*, 730 F.3d at 953-54; *Tamkin v. CBS Broad., Inc.*, 122 Cal. Rptr. 3d 264, 270-71 (Ct. App. 2011); *Hall v. Time Warner, Inc.*, 63 Cal. Rptr. 3d 798, 805-06 (Ct. App. 2007).

Flo & Eddie argued below that Pandora's speech is copyright infringement and is therefore unprotected by the First Amendment. But "any 'claimed

29

illegitimacy of the defendant's acts is an issue which *the plaintiff* must raise and support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of plaintiff's case.'" *Navellier*, 52 P.3d at 712 (alteration in original) (emphasis added) (citation omitted). The question whether Pandora is engaged in "lawful broadcast[s]" or "unlawful broadcast[s]" is irrelevant at the first step of the anti-SLAPP inquiry. *Gangland*, 730 F.3d at 954.

### 2. Pandora's broadcasts of pre-1972 sound recordings are connected to an issue of public interest

Pandora's streaming of pre-1972 sound recordings is also plainly connected to an issue of public interest within the meaning of the anti-SLAPP statute—as Flo & Eddie has never disputed. *See* ER3-4. California courts have repeatedly held that the dissemination of art and popular culture is protected activity under the anti-SLAPP statute. *See Hilton*, 599 F.3d at 907-08 (publication of greeting card featuring celebrity's likeness and catchphrase); *No Doubt v. Activision Publ'g, Inc.*, 122 Cal. Rptr. 3d 397, 404 (Cal. Ct. App. 2011) (use of band members' likenesses in a video game); *Stewart v. Rolling Stone LLC*, 105 Cal. Rptr. 3d 98, 109 (Cal. Ct. App. 2010) (publication of the names of "indie rock" musicians in a magazine gatefold); *Tamkin*, 122 Cal. Rptr. 3d at 272 ("the writing, casting, and broadcasting" of a television show).

Indeed, in 2003, when California passed legislation to exempt certain actions "brought solely in the public interest" from anti-SLAPP procedures, Cal. Civ. Proc. Code § 425.17(b), it explicitly recognized that conduct like Pandora's could be protected by carving out of that exception actions arising from "the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, *musical*, political, or artistic work," *id.* § 425.17(d)(2) (emphasis added). This damages action is obviously not one "brought solely in the public interest," but it is instructive that the California legislature acknowledged that disseminating or exhibiting "musical … work[s]" falls within the statute. *See Cal. State Restaurant Ass'n v. Witlow*, 129 Cal. Rptr. 824, 827-28 (Ct. App. 1976) ("[T]he statute should be construed … in harmony with the whole system of law of which it is a part.").

According to plaintiffs themselves, the Turtles are "one of the most influential bands of the 1960s," and the recordings at issue in this case include the Turtles' most acclaimed works. ER157 ¶ 7. These recordings, plaintiffs allege, "have defined generations." ER156 ¶ 3. "[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Stewart*, 105 Cal. Rptr. 3d at 109 (citation omitted). Pandora's dissemination of

such allegedly iconic sound recordings to millions of American is speech connected to an issue of public interest protected by the anti-SLAPP statute.

**B. Flo & Eddie Cannot Establish A Reasonable Probability That They Will Prevail On Their Claims**

Because all of Flo & Eddie's claims arise from protected activity, the burden shifts to Flo & Eddie "to establish a reasonable probability that it will prevail on its claim[s] in order for th[ose] claim[s] to survive dismissal." *Makaeff*, 715 F.3d at 261. "Under this standard, the claim should be dismissed if the plaintiff presents an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, 'no reasonable jury could find for the plaintiff.'" *Id.* (citation omitted). Flo & Eddie has no legal basis for any of its claims.

**1. Flo & Eddie does not own any California copyrights in the sound recordings at issue**

Flo & Eddie's California copyright claim fails because state copyright protection of the Turtles' 1960s recordings expired when those sound recordings were published, and the 1982 amendment to California copyright law did not resurrect that protection decades after it was lost.

*(a) Flo & Eddie's California copyrights expired when the Turtles sold their recordings*

California law divested Flo & Eddie's sound recordings of state copyright protection when the Turtles deliberately sold those recordings to the public long before 1982. The Complaint alleges that the works in suit include that band's

"string of Top 40 hits," which Flo & Eddie "has been … engaged in the business of distributing, selling and/or licensing." ER157 ¶¶ 7, 9. By Flo & Eddie's own admission, these sound recordings were thus "publish[ed]" within the meaning of the common law—and therefore former Civil Code § 983(a)—decades ago. *See RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940) (holding that the sound recordings were published with "the sale of the records"); ER113 (amending section 983 in 1947 to conform California copyright "publication" doctrine to the then-prevailing nationwide norm); *see also* Melville B. Nimmer, *Copyright Publication*, 56 Colum. L. Rev. 185, 191 (1956) ("[P]ublic disposition of phonograph records by sale or otherwise constitutes a publication ...."). State copyright protection under Cal. Civ. Code § 980(a) ended with that publication. *See* Cal. Civ. Code § 983(a) (1949).

This Court's own precedent compels that conclusion. In *Lone Ranger Television, Inc. v. Program Radio Corp.*, this Court held that sound recordings made in California in the 1950s and licensed for commercial use in the 1960s had been stripped of their state copyright protection under the version of Civil Code § 983(a) in effect during the time of the works' initial "commercial distribution." *See* 740 F.2d 718, 725-26 (9th Cir. 1984). The Court explained that the owner's acts of "publishing [the audio recordings] in radio broadcasts and sales for home use" satisfied the section 983(a) requirements "for divesting state or common law

copyright." *Id.* The plaintiff therefore had no cognizable state copyright claims. *Id.* The same is true here, given that the Turtles indisputably published the sound recordings at issue in the 1960s (or at least before 1982).

> **(b)** *The 1982 amendment to California copyright law did not resurrect Flo & Eddie's copyrights.*

The 1982 amendment to sections 980 and 983 did not resurrect previously divested copyright protection for sound recordings. As explained, the 1982 law did nothing more than revise California's copyright statute to account for the fact that federal law had recently preempted most state copyright laws, and to expressly confine California's copyright statute to its proper subjects (*i.e.*, areas not expressly preempted by the 1976 Act). The 1982 amendment did not expand the protection afforded by California's copyright statute, much less radically alter the copyright regime applicable to the broadcast of sound recordings. Instead, the 1982 amendment contracted prior law in part (by narrowing the categories of works protected), and preserved it in part (by recodifying pre-existing protection for works still permissibly governed by state law). But the 1982 amendment did not resurrect any protection that did not already exist, or had been lost, before the amendment. That is why it made no difference in *Lone Ranger* that California's legislature enacted the current version of section 980(a)(2) during the pendency of that suit. *See* 740 F.2d at 725.

Under California law, "the touchstone of statutory interpretation" is "the probable intent of the Legislature." *People v. Molina*, 15 Cal. Rptr. 3d 493, 497 (Ct. App. 2004) (citation omitted). To interpret statutory text, California courts must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." *Id.* (citation omitted). As in federal court, California courts begin by "scrutiniz[ing] the actual words of the statute, giving them a plain and commonsense meaning." *Id.* (citation omitted). But the words of the statute must always "be construed in context, keeping in mind the statutory purpose." *Kane v. Hurley*, 35 Cal. Rptr. 2d 809, 811 (Ct. App. 1994) (citation omitted). "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." *Id.* (citation omitted). And a crucial component of that inquiry is "the state of the law as it existed prior to the enactment." *People v. Horn*, 205 Cal. Rptr. 119, 130 (Cal. Ct. App. 1984). Nothing about the text, legislative history, nor historical circumstances of the 1982 amendment evince any intent to retroactively override 100 years' worth of statutory divestiture by publication in California.

The text of revised section 980(a)(2) cannot bear the weight that the district court placed on it. Prior to the 1982 amendment, California law had granted the "author or proprietor of any composition in letters or art" the "exclusive ownership in the representation or expression thereof" until publication, Cal. Civ. Code

§§ 980(a), 983(a) (1949). After the 1982 amendment, the rights-granting portion of section 980 is nearly an exact match; the only difference is that instead of covering "any composition in letters or art," the trimmed down version addresses only an "original work of authorship that is not fixed in any tangible medium of expression," Cal. Civ. Code § 980(a)(1), and an "original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972," *id.* § 980(a)(2). Consistent with the clean-up purpose of the law, these are the two categories of state copyright protection that the federal 1976 Act had not expressly preempted. *See* 17 U.S.C. § 301(b)(1), (c).

The repeal of section 983, of course, meant that "exclusive ownership" granted by the preserved categories of California copyright protection would not be lost upon publication in the future. But the salient textual point is that the words of the statute say *nothing* about resurrecting "exclusive ownership" that had been lost while section 983 was still in effect. And the legislature's evident statutory purpose of confining California copyright protection to non-preempted subjects certainly does not support construing the text to fundamentally transform California's state copyright regime by granting a new term of protection to every sound recording ever published in California.

The district court focused on the "broadly phrased codification of 'exclusive ownership rights ... as against all persons,'" and reasoned that the 1982 amendment

36

must have resurrected previously divested copyrights because otherwise section 980(a)(2) would have affected only a limited universe of sound recordings—namely, sound recordings fixed prior to 1972 that had not yet published by 1982. *See* ER11. But Section 980's "exclusive ownership" language was carried over word-for-word from the prior version of section 980. *See* Cal. Civ. Code § 980(a) (1949). Contrary to the district court's reasoning, it would be have been passing strange for the legislature to use *any other language* to preserve California copyright protection for sound recordings as such protection existed in 1982.

The fact that the 1982 law did not do *more* than preserve the rights in sound recordings that had not yet been published does not mean the law was "impotent." *Cf.* ER11. As the Beatles, the Beach Boys, Bob Dylan, Jimi Hendrix, and Hank Williams (or their heirs) could attest, those rights covered countless recordings, including many of tremendous historical and economic value. *See* Allan Kozinn, *Rare Dylan Recordings Set for Release in Copyright-Extension Bid*, N.Y. Times, Dec. 5, 2014, http://artsbeat.blogs.nytimes.com/2014/12/05/rare-dylan-recordings-set-for-release-in-copyright-extension-bid/; James C. McKinley Jr., *Exhuming the Last of Hendrix's Studio Sessions*, N.Y. Times, Mar. 6, 2013, http://www.nytimes.com/2013/03/07/arts/music/people-hell-and-angels-the-last-of-hendrix.html; Jon Lusk, *Hank Williams: The Unreleased Recordings Review*, BBC Review (2008), http://www.bbc.co.uk/music/reviews/vnxm. To be sure, keeping

California copyright protection for sound recordings where it stood in 1982—while removing preempted portions of the law—was hardly revolutionary. But that was the point.

The legislative history and backdrop of the 1982 amendment strongly support this interpretation. *See Molina*, 15 Cal. Rptr. 3d at 498; *Horn*, 205 Cal. Rptr. at 130-31. That history clearly shows that the sole purpose of the amendment was to "conform California law to the new federal law" by "remov[ing] preempted and thus ineffectual laws from the codes." ER38. As the California Governor was told, the revision only "ma[de] technical and minor policy changes in the State copyright laws." ER63, *see also* ER86 (same). And for sound recordings specifically, the legislative history repeatedly indicates that the Act was meant to do nothing more than "maintain rights and remedies" where they previously stood. *See* ER30, 39, 44, 70.

That is exactly the opposite of what one would expect to find in the legislative history if the legislature had intended to fundamentally transform California's copyright regime for sound recordings—*i.e.*, retroactively extending its protection, for the first time ever, to previously published works, whose copyrights had been terminated for decades. "In a case where the [proposed] construction of legislative language ... makes so sweeping and so relatively unorthodox a change ... judges as well as detectives may take into consideration

the fact that a watchdog did not bark in the night." *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) (citation omitted). Had the legislature intended to make a change to the law with such "dramatic ... consequences," one "would expect to find some trace of this intent in the legislative history." *Brodie v. Workers' Comp. Appeals Bd.*, 156 P.3d 1100, 1109 (Cal. 2007). Yet none exists—neither in the formal legislative history nor in any other source. To the contrary, the 1982 amendment passed without *any* "known opposition to the bill." ER66.

It is unthinkable that the legislature effected such a revolutionary change without any legislator raising an objection to the amendment and without any evidence that a single songwriter or anyone in the broadcasting industry so much as wrote a letter to the editor against it. More incredible still is the suggestion that not a single record label or performing artist noticed this windfall, or raised an alleged entitlement to it in any court, for the ensuing thirty years. It took more than four decades of lobbying by performers and the recording industry, against the vociferous opposition of broadcasters and songwriters, to convince Congress to grant any form of federal copyright protection to sound recordings. *See supra* at 8-11. And, even then, Congress was careful to grant protection only for new recordings and to withhold the public performance right. *Id.* Yet, under the district court's reading of section 980, the California legislature granted retroactive

protection—including an unprecedented extension of the public performance right—to these same recordings. And no one said a word?

Such a broad-scale and retroactive rescission of works from the public domain also would raise serious constitutional concerns. In *Golan v. Holder*, the Supreme Court upheld the constitutionality of Congress' targeted extension of copyright protection to a collection of foreign-authored works, pursuant to the United States' treaty obligations. 132 S. Ct. 873, 878, 894 (2012). In so doing, however, the Court noted a series of elaborate protections Congress provided for "reliance parties" to mitigate the "disturbance of the public domain" and make the Act "compatib[le] with the Fifth Amendment's Taking Clause." *Id.* at 882-83 & 892 n.33. The federal 1971 Act similarly refused to grant retroactive rights to recordings made before it went into effect. California's 1982 amendment, of course, contains no such cautionary measures (on the district court's reasoning). If the amendment was nevertheless construed to accomplish the largest rescission of works from public domain in U.S. history, the absence of any protections for reliance interests would raise serious constitutional concerns. That is reason enough to avoid such a construction. *See Elkins v. Superior Court*, 163 P.3d 160, 170 (Cal. 2007) ("[I]f reasonably possible, statutory provisions should be interpreted in a manner that avoids serious constitutional questions." (citation omitted)).

Finally, such a regime would also be completely unworkable. Who, precisely, would own these zombie copyrights? The performing artists? Which ones—all of them jointly? The label? One of the least likely candidates would be some alleged former third-party assignee of those rights, like Flo & Eddie. *See* Cal. Civ. Code § 980(a)(2) (preserving copyright protection in the "author" of a pre-1972 sound recording). Resurrecting protection for recordings going back to the earliest days of the medium would thus have created an impossible-to-administer system of rights going back decades before anyone knew they existed, owned in large part by heirs of artists or record label executives long since deceased, for no discernible public policy reason. *Cf. Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509-10 (1989) (refusing to adopt a reading even the "plain language commands," where it produced an absurd and perhaps unconstitutional result).

In sum, section 980(a)(2) cannot be construed to create copyright protection today for sound recordings that were published decades ago, and Flo & Eddie's state law copyright claim fails for this reason alone.

### 2. California copyright law does not confer an exclusive right to publicly perform popular sound recordings

Even if section 980(a)(2) could be construed to confer state copyright protection in published sound recordings, such protection does not prevent Pandora from streaming those recordings to Pandora's users. Any California copyright

protection for sound recordings does not include the exclusive right to publicly perform them or to make ancillary copies in the course of a broadcast.

1. The district court reasoned that because ownership generally means "to possess and control" a thing to the exclusion of others, ownership of a sound recording under section 980(a)(2) must include "*all* rights that can attach to intellectual property, save the singular, expressly-stated exception for making 'covers' of a recording." *Sirius*, 2014 WL 4725382, at *4-5 (emphasis added). But ownership does not by itself imply the right to *every* conceivable use of a thing. As has been long understood, ownership consists instead of a "bundle of rights and liberties." John Maurice Clark, *Social Control of Business* 94 (1939). That bundle includes the right to carry out "a circumscribed list of actions," not any action one can imagine. R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1, 44 (1960). This is especially true of intellectual property, "a particularly costly form of property [that] we would expect [to be] ... limited in ways that physical property is not." William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & Econ. 265, 268 (1987). "Truly exclusive (absolute, unqualified) property rights would be a contradiction in terms." Richard A. Posner, *Economic Analysis of Law* 63 (8th ed. 2011).

The California legislature's description of the ownership vested by section 980(a)(2) as "exclusive" does not change that analysis. In context, the statutory

term "exclusive" says nothing about *which* rights are included in the ownership bundle—only that the rights that *are* included are not shared. Joint authors, for example, have never been awarded "exclusive" ownership under section 980; instead, they share ownership with their co-authors. *See* Cal. Civ. Code § 981 (1874). But no one would suggest that the rights that these joint authors share are any different than the rights granted to a sole author.

Likewise, the legislature's explicit reference to the so-called right to make cover songs does not imply that ownership includes the exclusive right to engage in every other possible use. That statutory language provides a limitation on the ownership rights in sound recordings; it does not define what those rights are in the first instance. Indeed, the same words appear in a list of limitations on federal protection of sound recordings in the Copyright Act, *see* 17 U.S.C. § 114(b); Pub. L. No. 94-553, § 114(b), 90 Stat. 2541, 2560 (1976)—wholly apart from the enumerated list of exclusive rights that attach to sound recordings under federal law, which are addressed in different provisions altogether, *see* 17 U.S.C. §§ 106, 114(a); Pub. L. No. 94-553, §§ 106, 114(a), 90 Stat. at 2546, 2560. As a result, in the federal statute, the "cover song" exception has no bearing on whether the owner of a sound recording copyright enjoys the exclusive right of "public performance." There is no basis to conclude that the California legislature's use of the same language was intended to achieve any different result.

43

Moreover, even if the exclusive rights in sound recordings could be defined solely by reference to the limitations on those rights, it would not follow that the legislature intended the "cover song" exception to be the only limitation. The district court invoked the canon of *expressio unius est exclusio alterius*. *See Sirius*, 2014 WL 4725382, at *5 (citing *Geertz v. Ausonio*, 6 Cal. Rptr. 2d 318, 321 (Cal. Ct. App. 1992)); *Geertz*, 6 Cal. Rptr. 2d at 321 (describing the "familiar rule of construction ...: where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed"). But that canon is not talismanic; it "always is subordinate to legislative intent," *Silverbrand v. County of L.A.*, 205 P.3d 1047, 1060 (Cal. 2009). "*Expressio unius*" thus "does not apply 'unless it is fair to suppose that [the legislature] considered the unnamed possibility and meant to say no to it.'" *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (citation omitted).

As Justice Scalia and co-author Bryan Garner explain:

> The doctrine properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved. Common sense often suggests when this is or is not so. The sign outside a restaurant "No dogs allowed" cannot be thought to mean that no other creatures are excluded—as if pet monkeys, potbellied pigs, and baby elephants might be quite welcome.

Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012). The *unum* here—the right to make cover songs—cannot reasonably be thought to be an expression of *all* the permitted uses of sound recordings by other parties.

After all, an ownership in sound recordings that included "the exclusive right to *any use* of a recording (other than the singular listed exception)," *Sirius*, 2014 WL 4725382, at *8 (emphasis added), would exclude even *fair uses* by others, *see Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985) ("Fair use was traditionally defined as 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.'" (citation omitted)). But that traditional limitation on copyright ownership is *constitutionally mandated*. *See Golan*, 132 S. Ct. at 890 (describing "fair use" as a "built-in First Amendment accommodation[]" (citation omitted)); *see also* Neil Weinstock Netanel, *First Amendment Constraints on Copyright after Golan v. Holder*, 60 UCLA L. Rev. 1082, 1086 (2013) ("[N]either Congress nor the courts may eviscerate copyright law's … fair use privilege without running afoul of the First Amendment."). Such constitutional difficulties are again reason alone to reject the district court's interpretation. *See Elkins*, 163 P.3d at 169-70. "No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution." *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448-49 (1830) (Story, J.).

The logic of the district court's interpretation of section 980(a)(2) would also preclude the application of the traditional "first sale" limitation—*i.e.*, the rule that "a sale of a 'lawfully made' copy terminates the copyright holder's authority to interfere with subsequent sales or distribution of that particular copy." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th Cir. 1994). "[F]or at least a century the 'first sale' doctrine has played an important role in American copyright law." *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (citing *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908)). Without it, every used record store in the state of California would be, and would have been for decades, a serial state copyright infringer. That result may be welcomed by Flo & Eddie, but it seems highly unlikely that the California legislature intended it.

Indeed, there is virtually no end to the possible uses of the Turtles' songs that common sense indicates the California legislature would not have intended to give Flo & Eddie the exclusive right to control—such as a consumer's decision to listen to sound recordings in his own home (*i.e.*, private performances) or even play a Turtles album at a house party, a nonprofit library's archiving of the songs for future generations, or a college instructor's playing to her students in a music history class. *Cf.* 17 U.S.C. § 110(1) (expressly exempting from federal infringement claims the "performance … of a work by instructors or pupils in the course of face-to-face teaching activities of a nonprofit educational institution"); *id.*

46

§ 108 (same for distributions of a sound recording by certain non-profit libraries). If Flo & Eddie's theory is correct, none of those uses can occur without its consent. And the district court's reasoning provides no basis for excluding any of these uses from the scope of "exclusive" rights granted to sound recording owners by Civil Code § 980(a)(2).

2. Once it is accepted that the bundle of rights included in the "exclusive ownership" of a sound recording cannot reasonably be read to equate to every possible use, then Flo & Eddie's California copyright claim must fail, even assuming that the sound recordings enjoyed some copyright protection. There is no support in any existing body of law or concept of ownership—common law, usage and practice, or any other source—for the district court's conclusion that an exclusive right to public performance (regardless of publication) is included in the bundle of rights that ownership of a sound recording provides.

There is none in the most obvious source for an analogous bundle of rights—the federal Copyright Act. When the California legislature passed the 1982 amendment, the federal 1976 Act explicitly withheld the public performance right for sound recordings. *See supra* at 11. Even today, federal law accords sound recording copyright owners only a limited exclusive right to public performances via digital transmission subject to a complicated compulsory license that could not possibly have been intended by the California legislature in 1982.

47

*See* 17 U.S.C. § 114. Indeed, Pandora is not aware of a single statute in the United States at any level of government that has *ever* made an unadorned exclusive right of public performance one of the rights that attached to sound recordings.

There is no support for a contrary result anywhere in California law, whether copyright or non-copyright. This Court's own decision in *Lone Ranger* refutes the existence of any such right under California copyright law. And as explained next, California's common law doctrines of misappropriation, unfair competition, and conversion have never granted anything like an exclusive right to publicly perform sound recordings (though the putative existence of such a right under these non-copyright doctrines was the lynchpin of the district court's reasoning). Another potentially relevant body of state law is California Penal Code § 653h, which since 1968 has made record piracy a *crime*. But even that prohibition reaches only the "[k]nowing[] and willful[] transfer[] [of] ... sounds that have been recorded on a phonograph record" (*i.e.*, their reproduction) and the distribution of such illicit copies, not their public performance. Cal. Penal Code § 653h(a).

Nor is there any support for the district court's result in the history of common usage of sound recordings. Indeed, that history strongly if not conclusively establishes that no such right exists. Generations of performers and record labels have failed to assert such a right despite the widespread, open, and unlicensed radio broadcasting of sound recordings since the inception of that

48

medium. "[S]o strong is the desire of every man to have the full enjoyment of all that is his, that, when a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known, it would be found that his alleged rights either never existed, or had long since ceased." *Halstead v. Grinnan*, 152 U.S. 412, 416 (1894).

In the end, Flo & Eddie can point to no source of law or concept of ownership that the California legislature could have sought to codify in section 980(a)(2) that would have granted them the exclusive right to public perform its recordings. That is an independent reason to reject its section 980 claim.[9]

---

[9]   If section 980(a)(2) does not include an exclusive right of public performance, then Flo & Eddie's allegations concerning reproduction and distribution in violation of section 980(a)(2) also fail. Making or distributing ephemeral ancillary copies in the course of carrying out public performances permitted by law, or devising playlists for listeners, ER159-60 ¶ 20, is a paradigmatic fair use. *See Golan*, 132 S. Ct. at 890 (fair use is a constitutionally required First Amendment limitation on copyright); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) ("The copying function performed automatically by a user's computer to assist in accessing the Internet is a transformative use."); *cf. Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008) (temporary copies produced in the course of carrying out a broadcast are not *prima facie* acts of infringement at all).

### 3. Flo & Eddie's resort to non-copyright common law doctrines also is unavailing

Without a viable claim under California copyright law, Flo & Eddie's claims under the common law doctrines of misappropriation, unfair competition, and conversion must also fail. *See* ER164-68 ¶¶ 35-58.

The district court relied on those doctrines to try to reconcile (on one hand) the legislative intent in 1982 to preserve the status quo with (on the other) the court's conclusion that the 1982 amendment resurrected copyright protection for every sound recording ever published in California. *See* ER13. In the court's view, Flo & Eddie's pre-publication *copyright* rights in their sound recordings have always been "maintained [after publication] through [these] common law property doctrines." *Id.* Thus, according to the district court, resurrecting copyright protection was a "non-event" because "sound recording owners already enjoyed post-publication protection in California" under these common law doctrines. *Id.* Both conclusions are wrong.

Non-copyright common law doctrines do afford *some* legal limits on the use of published sound recordings, just as they restrict the use of any number of goods, and just as countless other bodies of law continue to apply to sound recordings that do not enjoy copyright protection. But there is no basis to conclude that the misappropriation, unfair competition, or conversion doctrine may be invoked to replicate, or even approach, the full suite of *copyright* rights—such that divestive

50

publication was somehow a "non-event" (ER13), or that Flo & Eddie could exploit these ancillary doctrines to establish liability for Pandora's broadcasts that it cannot establish through copyright. *See, e.g.*, U.S. Copyright Office Study No. 26, at 11 (explaining that "[c]ommon law copyright and unfair competition ... are quite different" and that "it is essential that the two concepts be sharply distinguished"); *cf. 1936 Hearings*, 74th Cong. 639 ("While it has been held ... that the duplication of a phonograph record and the selling of that record is an act of unfair competition against the original manufacturer of the record, it would be going a long way for any court to say, and our attorneys would hesitate to ask any court to say, that the playing of a record over the air, the mere use of a record in that manner, is an act of unfair competition against the manufacturer of the record.").

Indeed, only two reported California cases have ever found that a defendant's use of sound recordings unprotected by copyright was nevertheless barred by California law—*Capitol Records, Inc. v. Erickson*, 82 Cal. Rptr. 798 (Ct. App. 1969), and *A&M Records, Inc. v. Heilman*, 142 Cal. Rptr. 390 (Ct. App. 1977). In both cases, the defendants were unabashedly engaged in the business of record piracy—buying the plaintiffs' records, duplicating them, and reselling the pirated copies to the public in direct competition with the original creator. *Erickson*, 82 Cal. Rptr. at 799; *Heilman*, 142 Cal. Rptr. at 394. The courts relied on the defendants' intentional interference "with the normal operation of

complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not." *Erickson*, 82 Cal. Rptr. at 802 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 240 (1918)). And they based their conclusions that the defendants' conduct constituted civil misappropriation, unfair competition, and conversion partly on the basis that California Penal Code § 653h made it a misdemeanor to engage in such record piracy (*i.e.*, duplication and sales in competition with a *bona fide* distributor). *See id.* at 805; *Heilman*, 142 Cal. Rptr. at 400 (relying on § 653h as providing the "intangible property right" that had been misappropriated and converted by the defendants); *see also Lone Ranger*, 740 F.2d at 725-26 (relying on *Heilman* and *Erickson* to prevent the unlicensed "duplicat[ion] and distribut[ion]" of Lone Ranger's recordings).[10]

Broadcasting previously published sound recordings is nothing like the pirating of records. Record piracy is nothing more than "petty theft," and outright appropriation of property. *People v. Szarvas*, 191 Cal. Rptr. 117, 123 (Ct. App. 1983) (preventing "double punishment" for committing record piracy under § 653h and petty theft under California Penal Code § 484). The radio broadcast of sound

---

[10] As noted above, Penal Code § 653h extends only to the illicit reproduction and distribution of sound recordings. Cal. Penal Code § 653h(a). It explicitly *excludes* from its scope "any person engaged in radio or television broadcasting" who reproduces sound recordings "in connection with[] broadcast transmission." *Id.* § 653h(g).

recordings is a legitimate business practice that for generations has been understood to take nothing from the performing artists or their record labels. Indeed, in stark contrast to record piracy, broadcasting music has long been thought to provide *substantial benefits* to the owner of the sound recording through public exposure that leads to *higher* profits. *See* Bard & Kurlantzick, *supra*, at 195 ("It is an accepted fact that radio play stimulates record sales by exposing new releases to potential buyers ...."); Ken Hendricks & Alan Sorenson, *Information and Skewness of Music Sales*, 117 J. Pol. Econ. 324, 365 (2009); Nielsen, *Study: Radio Airplay and Music Sales* (2013), http:/www.nab.org/documents/newRoom/ pdfs/Nielsen_Airplay_Sales_Study.pdf.[11]

There is also an even more fundamental reason why California courts have never invoked non-copyright doctrines like misappropriation, unfair competition, or conversion to replicate pre-publication copyright protection for sound

---

[11] In a similar vein, federal law recognizes a sharp distinction between digital platforms that are and are not likely to cannibalize record sales. Pandora's streaming service, by law, falls in the latter category. In technical terms, it is a "non-interactive service" under 17 U.S.C. § 114, and so is prevented by statute from giving its customers the ability to receive, "on request, a transmission of a particular sound recording." *In re Pandora Media*, 6 F. Supp. 3d 317, 332 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc. v. American Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015). That statutory restriction is the direct result of Congress's recognition that on-demand digital music services could effectively usurp purchases of physical tapes or CDs, but services (like Pandora) limited by section 114's stringent requirements would not. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 153-54 (2d Cir. 2009).

recordings against all the world. The California Court of Appeal historically understood that federal copyright law *preempted* state law theories of protection that essentially mimicked copyright (in published works). In common law cases involving sound recordings (in California and elsewhere), courts went out of their way to state that conduct amounting to misappropriation, unfair competition, or conversion was *different* from conduct amounting to copyright infringement. *See* Howard B. Abrams, *Copyright, Misappropriation, and Preemption*, 1983 Sup. Ct. Rev. 509, 526. As the *Erickson* court explained, U.S. Supreme Court precedent "prohibit[ed] state injunctions against copying but not against appropriations." *Erickson*, 82 Cal. Rptr. at 803 (citation omitted). California courts thus specifically defined these non-copyright doctrines *not* to replicate copyright rights.

Real-world history bears this out. The swift and drastic reaction of performing artists to *Whiteman*'s recognition of divestive publication in sound recordings simply cannot be squared with the district court's understanding of these common law doctrines. It is implausible to think that Petrillo and the American Federation of Musicians imposed a 27-month long nationwide recording ban based on a "non-event." ER13. In light of this history and precedent, there can be no question that the "post-publication protection[]" available under the *non-copyright* common law doctrines of misappropriation, unfair competition, and conversion has never provided the same rights as *copyright* law and, more to the

54

point, has never entitled performers or others to royalties for the broadcast of previously published sound recordings.[12]

The district court therefore erred in turning to *non-copyright* doctrines to create post-publication rights in sound recordings that California *copyright* law has never afforded.

## II. AT A BARE MINIMUM, THE COURT SHOULD CERTIFY THE DISPOSITIVE CALIFORNIA LAW QUESTIONS TO THE CALIFORNIA SUPREME COURT

No California court has ever recognized the extraordinary state law rights that Flo & Eddie seek to assert, and the existing authorities dictate that no California court ever would. For this reason, Pandora requests that this Court reverse the district court's order with instructions to strike Flo & Eddie's claims. At a minimum, however, the Court should not be the *first* appellate tribunal to recognize such rights. Rather, if the Court has any doubt about whether California

---

[12] In *Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010), a federal district court relied on *Heilman* to find the defendant liable for reproducing and distributing the plaintiff's pre-1972 sound recordings over the Internet. *Id.* at 1205-06. In so doing, the court included the public performance of those sound recordings in the list of the defendants' wrongs. *Id.* at 1206 ("Bluebeat does not dispute that, like the Copyrighted Recordings, it reproduced, sold, and publicly performed the pre-1972 Recordings without proper authorization. For these actions, Bluebeat is liable for misappropriation, unfair competition, and conversion." (citation omitted)). The court provided no justification for this over-reading of *Heilman*, which did not affect the result in the case. In any event, the decision is of course not binding on this Court and, devoid of any reasoning, it is unpersuasive.

law supports Flo & Eddie's claims, Pandora requests that the Court certify the

following questions to the California Supreme Court:

> (1) Does Civil Code § 980(a)(2) resurrect state copyright protection in pre-1972 sound recordings that were sold to the public before 1982?

> (2) Does Civil Code § 980(a)(2) grant owners of pre-1972 sound recordings sold to the public before 1982 the exclusive right to publicly perform those works?

> (3) If the answer to questions (1) and (2) is "no," does the California law of misappropriation, unfair competition, or conversion grant such owners the right to prevent others from publicly performing those sound recordings?

The California Supreme Court has authority to decide a question of

California law certified to it by this Court if "[t]here is no controlling precedent"

on the question and the Supreme Court's answer "could determine the outcome" of

the litigation. Cal. R. Ct. 8.548(a). And this Court has the authority to certify such

questions at its discretion. *See Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

Factors guiding the exercise of that discretion include the significance of the issue,

the possibility of delay, the likelihood the issue will recur, and the ability to frame

a precise legal question that will produce a helpful response from the Supreme

Court. *See Kleffman v. Vonage Holdings Corp.*, 551 F.3d 847, 849 (9th Cir. 2008);

*In re McLinn*, 744 F.2d 677, 681-82 (9th Cir. 1984).

If existing precedent does not control the outcome of this case in Pandora's

favor, then the issues at stake clearly meet the California Supreme Court's

requirements for certification, and this Court should exercise its discretion to seek that court's guidance. This litigation involves "substantial issue[s] of state law in an arena that will have broad application." *Kremen v. Cohen*, 325 F.3d 1035, 1038 (9th Cir. 2003). Affirming the district court's rulings would "wreak havoc with existing commercial practices" of all entities that deal with pre-1972 sound recordings in California. Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Law Blog (Oct. 1, 2014), http://blog.ericgoldman.org/archives/2014/10/a-seismic-ruling-on-pre-1972-sound-recordings-and-state-copyright-law-flo-eddie-v-sirius-xm-radio-guest-blog-post.htm. And not only are the issues *likely* to recur, they already have. In the wake of the district court's *Sirius* decision, materially indistinguishable class action lawsuits have also been filed against iHeartMedia, Cumulus Media, CBS Corporation, and other digital and terrestrial broadcasters.[13] More are certain to follow.

---

[13] *See Sheridan v. iHeartMedia, Inc.,* No. 2:15-cv-04067-RSG-GJS (C.D. Cal.); *ABS Entmt., Inc. v. CBS Corp.*, No. 2:15-cv-06257-PA-AGR (C.D. Cal.); *ABS Entmt. v. Cumulus Media Inc.*, No. 2:15-cv-06269-PA-AGR (C.D. Cal.); *ABS Entmt., Inc. v. iHeartMedia, Inc.*, No. 2:15-cv-06252-PSG-GJS (C.D. Cal.); *see also Capitol Records, LLC v. Sirius XM Radio, Inc.*, No. BC520981 (Cal. Super. Ct.) (pre-dating this litigation).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed or, alternatively, the dispositive questions of California law set forth above should be certified to California Supreme Court.

Dated:  September 2, 2015                Respectfully submitted,

                                         s/ Gregory G. Garre
                                        Gregory G. Garre
                                            *Counsel of Record*
                                        Jonathan Y. Ellis
                                        LATHAM & WATKINS LLP
                                        555 Eleventh Street, NW, Suite 1000
                                        Washington, DC  20004
                                        Telephone:  (202) 637-2007
                                        Facsimile:   (202) 637-2201
                                        gregory.garre@lw.com
                                        jonathan.ellis@lw.com

                                        James K. Lynch
                                        Andrew M. Gass
                                        LATHAM & WATKINS LLP
                                        505 Montgomery Street, Suite 2000
                                        San Francisco, California  94111
                                        Telephone:  (415) 391-0600
                                        Facsimile:   (415) 395-8095
                                        jim.lynch@lw.com
                                        andrew.gass@lw.com

                                        *Attorneys for Pandora Media, Inc.*

## STATEMENT OF RELATED CASES

Appellant is unaware of any related cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28.2.6.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, Brief for Appellant is proportionately spaced, has a typeface of 14 point and contains 13,947 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

 s/ Gregory G. Garre
Gregory G. Garre

## CERTIFICATE OF SERVICE

I, Gregory G. Garre, hereby certify that I electronically filed the foregoing Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 2, 2015, which will send notice of such filing to all registered CM/ECF users.

 s/ Gregory G. Garre
Gregory G. Garre