No. 15-55287

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

————————————

PANDORA MEDIA, INC.,

*Defendant-Appellant*,

v.

FLO & EDDIE, INC.,

*Plaintiff-Appellee.*

————————————

**On Appeal from the United States District Court
for the Central District of California
Case No. 2:14-cv-07648-PSG-RZ**

---

**BRIEF OF AMICUS CURIAE
RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. IN SUPPORT OF
PLAINTIFF-APPELLEE FLO & EDDIE, INC. AND AFFIRMANCE**

---

George M. Borkowski
RECORDING INDUSTRY
ASSOCIATION OF AMERICA, INC.
1025 F Street NW, Tenth Floor
Washington, DC  20004
Telephone:  202-775-0101
Fax:  202-775-7523

Kenneth L. Doroshow
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC  20001
Telephone:  202-639-6000
Fax:  202-639-6066

*Counsel for Amicus Curiae Recording
Industry Association of America, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(c)(1), *amicus curiae* the Recording Industry Association of America, Inc. (RIAA) hereby states that it is a nonprofit corporation that does not have a parent corporation and is not owned in any part by a publicly held corporation.


Dated: December 7, 2015                     By: */s/* Kenneth L. Doroshow
                                            Kenneth L. Doroshow

                                            *Counsel for Amicus Curiae*
                                            *Recording Industry Association of*
                                            *America, Inc.*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION ........................................................ 3

ARGUMENT ........................................................ 5

I.    CALIFORNIA HAS A COMPELLING INTEREST IN
PROTECTING ITS VIBRANT AND ECONOMICALLY
IMPORTANT MUSIC INDUSTRY ........................................................ 5

II.    DIGITAL STREAMING OF SOUND RECORDINGS IS THE
FUTURE OF THE MUSIC INDUSTRY ........................................................ 11

III.   RECOGNITION OF A PUBLIC PERFORMANCE RIGHT IN PRE-
1972 SOUND RECORDINGS IS ESSENTIAL TO PRESERVING
THE ECONOMIC VIABILITY OF AN ENTIRE ERA OF
IMPORTANT CREATIVE WORKS ........................................................ 12

     A.    Pre-1972 Sound Recordings Have Significant Economic Value
For Their Owners, Recording Artists, And Their Families ............... 12

     B.    Pre-1972 Sound Recordings Continue To Maintain Great
Cultural and Historical Significance ................................... 16

CONCLUSION ........................................................ 19

CERTIFICATE OF COMPLIANCE ........................................................ 20

CERTIFICATE OF SERVICE ........................................................ 21

# TABLE OF AUTHORITIES

## CASES

*California ex rel. State Lands Commission v. Superior Court*, 900
P.2d 648 (Cal. 1995) ........................................................................... 10

*Capitol Records, LLC v. Sirius XM Radio, Inc.*, No. BC520981 (Cal.
Super. Ct., L.A. Cty. Oct. 14, 2014) ..................................................... 3

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV 13-5693 (PSG),
2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) ..................................... 3

*People v. Kwak*, 63 Cal. App. 4th 1236 (1998) ..................................... 10

## STATUTES

17 U.S.C. § 106(6) ................................................................................ 11

17 U.S.C. § 114..................................................................................... 11

Cal. Civ. Code § 654 ............................................................................. 10

Cal. Civ. Code § 980(a)(2) ................................................................ 3, 10

## OTHER AUTHORITIES

500 Greatest Albums of All Time, Rolling Stone,
http://www.rollingstone.com/music/lists/500-greatest-albums-of-
all-time-20120531/the-beach-boys-pet-sounds-20120524 (last
visited Dec. 4, 2015) ......................................................................... 7-8

Copyright Law of the United States of America and Related Laws
Contained in Title 17 of the *United States Code*,
http://copyright.gov/title17/92chap8.html (last visited Dec. 4,
2015) .................................................................................................. 11

Keith Caulfield, *"Guardians of the Galaxy" Soundtrack Hits No. 1
On Billboard 200*, Billboard.com, Aug. 13, 2014,
http://www.billboard.com/articles/columns/chart-
beat/6214496/guardians-of-the-galaxy-soundtrack-no-1-billboard-
200................................................................................................... 15

*Dream Songs: The Music of the March on Washington*, New Yorker, Aug. 28, 2013, http://www.newyorker.com/culture/culture-desk/dream-songs-the-music-of-the-march-on-washington ............................ 17

Joshua P. Friedlander, *News and Notes on 2014 RIAA Music Industry Shipment and Revenue Statistics*, http://riaa.com/media/D1F4E3E8-D3E0-FCEE-BB55-FD8B35BC8785.pdf ....................................................................... 12

http://www.boxofficemojo.com/movies/?id=marvel2014a.htm (last visited Dec. 4, 2015) ....................................................................... 15

http://www.afi.com/100years/movies10.aspx (last visited Dec. 4, 2015) ................................................................................................... 7

http://www.dickdale.com/history.html (last visited Dec. 4, 2015) ........................... 7

Andrew Grant Jackson, *1965: The Most Revolutionary Year in Music* (2015) ................................................................................................. 18

Victor Luckerson, *Spotify and YouTube Are Just Killing Digital Music Sales*, Time, Jan. 3, 2014, http://business.time.com/2014/01/03/spotify-and-youtube-are-just-killing-digital-music-sales/ .................................................... 11

Jillian Mapes, *20 Old Songs Wes Anderson Gave New Life: A Playlist*, Flavorwire.com (Mar. 7, 2014, 1:00 PM), *available at* http://flavorwire.com/443888/20-old-songs-wes-anderson-gave-new-life-a-playlist ......................................................................... 14

Scott Mervis, *Rolling Stones Staple "Satisfaction" Celebrates 50 Years*, Pittsburgh Post Gazette, June 18, 2015, http://www.post-gazette.com/ae/music/2015/06/18/The-Rolling-Stones-song-Satisfaction-at-50/stories/201506180015 ....................................... 17-18

The Official Ed Sullivan Site, All Artists, http://www.edsullivan.com/all-artists/ (last visited Dec. 4, 2015) .................... 18

Amy Plitt, *25 Best "Mad Men" Musical Moments*, Rolling Stone, May 15, 2015, http://www.rollingstone.com/tv/lists/25-best-mad-men-musical-moments-20150515 ..................................................... 14

iv

RIAA, Economic Impact of the Music Community in the United
    States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-
    BA3D-398C68909018.pdf................................................................................1-2, 5

Ben Sisario, *Universal Music Posts Strong Results, and Streaming Is
    a Bright Spot*, N.Y. Times, Sept. 2, 2015,
    http://www.nytimes.com/2015/09/03/business/media/universal-
    music-posts-strong-results-and-streaming-is-a-bright-
    spot.html?smid=tw-ytmedia&smtyp=cur&_r=0 ................................................. 11

Isaiah Trost, *Hollywood Hillbilly*, Country Guitar (Winter 1994),
    *reprinted at* https://en.wikipedia.org/wiki/Bakersfield_sound........................... 6

Wikipedia, Complete List of Downloadable Songs for the *Rock Band*
    Series,
    https://en.wikipedia.org/wiki/Complete_list_of_downloadable_son
    gs_for_the_Rock_Band_series (last visited Dec. 5, 2015)................................ 15

Chris Willman, *Ailing Surf Guitar Legend Dick Dale Is Touring to
    Stay Alive* –Literally, Billboard, Aug. 13, 2015,
    http://www.billboard.com/articles/news/6663777/surf-guitar-
    legend-dick-dale-touring-illness ......................................................................... 7

## INTEREST OF AMICUS CURIAE

*Amicus curiae* Recording Industry Association of America, Inc. ("RIAA") respectfully submits this brief in support of Plaintiff-Appellee Flo & Eddie, Inc.[1]

The RIAA is the trade organization that supports and promotes the creative and financial vitality of the major recorded music companies. Its members are the music labels that comprise the most vibrant record industry in the world. RIAA members create, manufacture, and/or distribute 85% of all legitimate recorded music produced and sold in the United States. RIAA members depend on copyrights and state laws that safeguard property rights to protect the valuable performances embodied in sound recordings in which they have invested and which they have created in collaboration with recording artists and other creators.

California has the largest music industry in the United States. In California, nearly 25,000 people work in the industry as local musicians, performers, managers, and at music labels. Nearly one-fifth (17%) of this country's music professionals live and work in California, nearly twice as many as in the state with the next-largest music industry. California's music industry also supports over 7,500 local businesses. *See* RIAA, Economic Impact of the Music Community in the United States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-BA3D-

---

[1] No party's counsel has authored this brief in whole or in part. No one other than *amicus* and its members contributed money that was intended to fund preparing or submitting this brief.

398C68909018.pdf. Numerous music labels are incorporated or do business in California. California is also home to many recording artists, including those who created iconic sound recordings before February 15, 1972 (pre-1972 sound recordings) as well as artists who bring new and exciting music to the world today. *Amicus* and its members therefore have a significant interest in the important question this case presents concerning the protection of performances embodied in pre-1972 sound recordings under California law.

RIAA submits this *amicus curiae* brief, accompanied by a motion for leave to file the same, pursuant to Federal Rule of Appellate Procedure 29(a) and Circuit Rule 29-3.

## INTRODUCTION

It is clear that California law protects the rights of owners of pre-1972 sound recordings. *See, e.g.*, *Flo & Eddie, Inc. v. Pandora Media, Inc.*, No. 2:14-cv-07648 (C.D. Cal. Feb. 23, 2015) (ER8) (describing Cal. Civ. Code § 980(a)(2) as "a 1982 codification of pre-1972 sound recording ownership rights"). Section 980(a)(2) of the California Civil Code unambiguously provides that "[t]he author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972, has an exclusive ownership therein … as against all persons." The district court properly recognized that this language easily encompasses the exclusive right to publicly perform pre-1972 sound recordings. *See* ER9-14; *see also Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV 13-5693 (PSG) (RZx), 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) (holding that California law recognizes and protects the right to publicly perform pre-1972 sound recordings); *Capitol Records, LLC v. Sirius XM Radio, Inc.*, No. BC520981 (Cal. Super. Ct., L.A. Cty. Oct. 14, 2014) (same).

In addition to California statutory law, the district court understood the important role that California common law, which is flexible and adapts to new and varying conditions, plays in protecting intangible property rights (*see* ER11), reflecting this State's compelling interest in safeguarding the economic vitality of its music industry, which is the largest in the United States. The decision also

3

acknowledged the irreplaceable cultural and economic importance of pre-1972 sound recordings, not only in this State, but also in many others.

The district court was clearly correct. It appropriately found that, when the California legislature enacted section 980(a)(2), it intended to include within the statute's ambit broad rights to sound recordings. As the court stated, "California recognized and protected property rights in sound recordings not only through its copyright statutes . . . , but also through common law property concepts." ER 12. The district court thus properly gave effect to "this broadly protective statutory scheme," which represents "a legislative intent to maintain rights and remedies in pre-1972 sound recordings." ER13 (emphasis added). In doing so, the court prevented an injustice to the owners of pre-1972 sound recordings, who have invested, and regularly continue to invest, millions of dollars to develop, promote, and protect these recordings in order to introduce them to new generations of music fans. *Id*. The district court's ruling also ensured that recording artists and their families, who depend on compensation from the exploitation of sound recordings for their livelihoods (or simply to make ends meet) will be paid when recordings embodying their performances are exploited by companies such as Pandora. The district court's decision is correct on both the law and the equities. It should be affirmed in full.

**ARGUMENT**

## I.  CALIFORNIA HAS A COMPELLING INTEREST IN PROTECTING ITS VIBRANT AND ECONOMICALLY IMPORTANT MUSIC INDUSTRY.

The vitality and economic importance of California's music industry cannot be overstated.  California has the largest music industry of any state in the United States.  Nearly 25,000 Californians work in the music industry as musicians, performers, managers, and at music labels.  Nearly one-fifth (17%) of this country's music professionals live and work in California.  California's music industry also supports over 7,500 local businesses.  *See* RIAA, Economic Impact of the Music Community in the United States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-BA3D-398C68909018.pdf.

Hundreds of music labels are either headquartered in California or have substantial offices here across a wide range of musical genres, including UMG Recordings, Warner Bros. Records, Rhino Entertainment, Blue Note, Columbia, Def Jam, Interscope, and RCA.  Indeed, the iconic Capitol Records building, which resembles a stack of records and sits near the famed intersection of Hollywood and Vine, has been a Los Angeles landmark for decades.  The building is also the site of the historic Capitol Studios, where such legendary artists as Frank Sinatra, The Beach Boys, Nat "King" Cole, Paul McCartney, and many others recorded some of the most treasured songs in history.  Capitol Studios features subterranean echo

chambers designed by legendary guitarist and recording innovator Les Paul, and the reverb from those chambers has been featured on numerous of the studio's recordings, perhaps most famously on The Beach Boys classic "Good Vibrations" (1964).

California is also the birthplace and current home to many of the best-known recording artists of the pre-1972 era. In many ways, the history of California's music industry is the history of some of the world's most important pre-1972 sound recordings. In the 1950s and 1960s, Bakersfield, in California's Central Valley, gave rise to a new style of country music – the "Bakersfield Sound" – led by Buck Owens and Merle Haggard. Jean Shepard, one of country music's first significant female artists, recorded the hit "A Dear John Letter" (1953) for Capitol Records, exclusively using Bakersfield musicians. As Dwight Yoakam, the well-known modern recording artist who was heavily influenced by the Bakersfield Sound, explained:

> "Bakersfield" is not exclusively limited to the town itself but encompasses the larger California country sound of the Forties, Fifties, and on into the Sixties, and even the Seventies, with the music of Emmylou Harris, Gram Parsons, the Burrito Brothers and the Eagles—they are all an extension of the "Bakersfield Sound" and a byproduct of it.

Isaiah Trost, Hollywood Hillbilly, Country Guitar 31-32 (Winter 1994), *reprinted at* https://en.wikipedia.org/wiki/Bakersfield_sound.

Other genres were also coming to the fore in California. Artists like Chet Baker, Stan Getz, and Dave Brubeck popularized the harmonic West Coast jazz sound. This music grew out of the thriving jazz scene along Los Angeles' Central Avenue, featuring such legendary musicians as Charles Mingus and Dexter Gordon.

The early 1960s also introduced surf rock, and its most famous group, The Beach Boys. Surf rock allowed people around the world to enjoy the classic laid-back tunes of Southern California surfers. In addition to being catchy, surf rock was musically important; it was one of the first genres to universally adopt the electric bass guitar.[2] *Rolling Stone* named The Beach Boys' 1966 *Pet Sounds*, with hits such as "Wouldn't It Be Nice," "God Only Knows," and "Caroline, No," as the second-greatest album of all time, behind The Beatles pre-1972 *Sgt. Pepper's Lonely Hearts Club Band*. *See* 500 Greatest Albums of All Time, Rolling Stone,

---

[2] Surf rock was invented by Dick Dale in the 1950's. Dale, who is known as the "King of Surf Guitar," introduced his revolutionary sound at the famed Rendezvous Ballroom in Balboa, California. http://www.dickdale.com/history.html (last visited Dec. 4, 2015). His "Misirlou" (1963) was the backdrop to an iconic scene in Quentin Tarrantino's "Pulp Fiction," a motion picture that is on the American Film Institute's list of the Greatest 100 motion pictures of all time. http://www.afi.com/100years/movies10.aspx (last visited Dec. 4, 2015). Now very sick, Dale, at 78, is touring so that he can earn money for his medical treatment. Chris Willman, *Ailing Surf Guitar Legend Dick Dale Is Touring to Stay Alive –Literally*, Billboard, Aug. 13, 2015, http://www.billboard.com/articles/news/6663777/surf-guitar-legend-dick-dale-touring-illness. Dick Dale is merely one of countless artists who are being unfairly deprived of income from their pre-1972 recordings that they very much need.

http://www.rollingstone.com/music/lists/500-greatest-albums-of-all-time-20120531/the-beach-boys-pet-sounds-20120524 (last visited Dec. 4, 2015). Throughout the decade, still other musical movements were born in Southern California, including the Laurel Canyon community of recording artists that included The Byrds, The Doors, Frank Zappa, Buffalo Springfield, and Joni Mitchell, whose pre-1972 masterpieces include "Chelsea Morning," "Big Yellow Taxi," and, appropriately, "California."

Farther to the north was the San Francisco Sound, the psychedelic rock associated with the Bay Area's counterculture community. The Grateful Dead epitomized this musical movement, and The Dead were joined by the likes of Jefferson Airplane, Big Brother and the Holding Company, Moby Grape, and The Steve Miller Band. Sly and the Family Stone famously combined this psychedelic sound with soul and funk, while Santana fused blues and improvisational rock and roll with Latin music.

With this treasure trove of home-grown artists and musical movements, legendary California concert venues, such as the Hollywood Palladium, the Hollywood Bowl, Bill Graham's historic Fillmore, and Berkeley's Greek Theater, hosted these and other legendary performers across the decades. It is no surprise that the Grammy Museum is located in downtown Los Angeles and the National Academy of Recording Arts and Sciences is headquartered in Santa Monica.

Neither is it a surprise that the Grammy Awards have been held in Los Angeles for over ten years, no longer trading with New York for the honor. And it is no wonder that California repeatedly served as a muse for writers and producers of iconic pre-1972 recordings, such as The Mamas and The Papas' 1965 hit "California Dreamin'" and The Beach Boys' 1965 classic "California Girls."

California today remains the home of many of the best-known recording artists of the pre-1972 era, who rely on the royalties earned from the exploitation of their work. For example, pre-1972 recording artists that call California home include such music legends as Burt Bacharach, Carole King, Leonard Cohen, Bill Withers, Diana Ross, Stevie Wonder, Barbra Streisand, and Bob Dylan, as well as such diverse artists as rock and rollers Tommy James (whose chart-topping hits included "Crimson and Clover" and "Mony Mony") and Mitch Ryder ("Devil With The Blue Dress On"), pop crooner Pat Boone, and jazz greats Herbie Hancock, Wayne Shorter and Charles Lloyd. The list goes on and on.

This wealth of musical talent throughout the years exemplifies California's role as one of the world's most important centers for the creation of music. As the district court appropriately recognized, California has a compelling interest in affording the broadest possible statutory and common law protections for pre-1972 sound recordings.

9

As Appellee demonstrated in its brief, and as the district court correctly recognized, California protects pre-1972 sound recordings in two ways. First, Civil Code Section 980(a)(2) provides that "[t]he author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972, has an **exclusive ownership** therein . . . **as against all persons**." (emphasis added); *see also* Cal. Civ. Code § 654 ("The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others"); *People v. Kwak*, 63 Cal. App. 4th 1236, 1250-57 (1998) ("[P]roperty is something that one has the exclusive right to possess and use."). California also protects pre-1972 recordings under the long-recognized common law theories of misappropriation and conversion. *See* ER12 (citing *Lone Ranger Television, Inc., v. Program Radio Corp.*, 740 F.2d 718, 725-26 (9th Cir. 1984)). The District Court was correct when it interpreted Section 980(a)(2), and the common law underpinnings of this statute, to protect those who own property rights in pre-1972 sound recordings. "[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Cal. ex rel. State Lands Comm'n v. Superior Court*, 900 P.2d 648, 663 (Cal. 1995) (quotation marks omitted) (bracket in original). That is the case here. The District Court's decision should be affirmed.

## II. DIGITAL STREAMING OF SOUND RECORDINGS IS THE FUTURE OF THE MUSIC INDUSTRY.

Royalties from public performances of digital transmissions of post-1972 recordings over the Internet ("streaming") have now become the most significant and growing source of revenue for the music industry.[3]  Increasing numbers of consumers have turned to digital streaming services as their primary source of musical content.  *See* Ben Sisario, *Universal Music Posts Strong Results, and Streaming Is a Bright Spot*, N.Y. Times, Sept. 2, 2015, http://www.nytimes.com/2015/09/03/business/media/universal-music-posts-strong-results-and-streaming-is-a-bright-spot.html?smid=tw-ytmedia&smtyp=cur&_r=0 (reporting that Universal Music Group's "34 percent jump in subscription and streaming services during the first half of the year … 'more than offset the decline in both digital download and physical sales'" (internal quotation marks omitted)); Victor Luckerson, *Spotify and YouTube Are Just Killing Digital Music Sales*, Time, Jan. 3, 2014, http://business.time.com/2014/01/03/spotify-and-youtube-are-just-killing-digital-music-sales/ ("The rise of streaming has been swift.").  Between 2010 and 2014, the proportion of total United States music industry revenues from streaming grew from just 7 percent to 27 percent, amounting to roughly $2 billion

---

[3] The federal Copyright Act provides a right of digital public performance for post-1972 recordings, ensuring that the owners of such recordings are paid for their use. *See* 17 U.S.C. §§ 106(6) and 114; *see also* Copyright Law of the United States of America and Related Laws Contained in Title 17 of the *United States Code*, http://copyright.gov/title17/92chap8.html (last visited Dec. 4, 2015).

annually. *See* Joshua P. Friedlander, *News and Notes on 2014 RIAA Music Industry Shipment and Revenue Statistics*, http://riaa.com/media/D1F4E3E8-D3E0-FCEE-BB55-FD8B35BC8785.pdf. The right to license and to be compensated for the digital public performance of music is now more critical than ever to the vitality and the economic survival of California's music industry. The district court's recognition of a public performance right for pre-1972 sound recordings protects a critically important source of revenue for California's music industry, including for many legendary recording artists and their families.

### III. RECOGNITION OF A PUBLIC PERFORMANCE RIGHT IN PRE-1972 SOUND RECORDINGS IS ESSENTIAL TO PRESERVING THE ECONOMIC VIABILITY OF AN ENTIRE ERA OF IMPORTANT CREATIVE WORKS.

#### A. Pre-1972 Sound Recordings Have Significant Economic Value For Their Owners, Recording Artists, And Their Families.

Pre-1972 sound recordings remain financially important to the owners of those recordings, the artists who created and performed on them, and their families. RIAA members routinely invest substantial sums to acquire, promote, and market pre-1972 sound recordings. RIAA members' catalog divisions have hundreds of employees engaged in a full range of music label activities, including reissuing older albums, remastering recordings (which have been "fixed" on or before February 15, 1972), and producing box sets and special occasion releases. These pre-1972 sound recordings are regularly covered (*i.e.*, performed or recorded by

12

other musical acts), sampled, and used in other ways. The RIAA's members also license these recordings for movies, television, commercials, video games, and third-party compilations. As a result, pre-1972 sound recordings are continuously used and continue to generate significant revenue.

RIAA members continue to invest in acquiring, promoting, and marketing pre-1972 sound recordings because those works remain commercially popular. These pre-1972 recordings are not flashes in the pan—they are "evergreen" and have proven their value by standing the test of time. A large percentage of best-selling recordings sold today are compilations or reissues of pre-1972 sound recordings that still have great appeal to music fans discovering the history of rock and roll (so-called "millennials" are now driving the vinyl record trend) and connoisseurs alike. They may both want to listen to "Elvis 2nd To None," "The Very Best of Frank Sinatra," and "The Very Best of the Rolling Stones, 1964-1971."

Of course, it is not just music fans who contribute to the popularity of pre-1972 sound recordings; the recording artists of the era have been kept alive in the public's consciousness through other media. Critically acclaimed and award winning "biopics" of musicians, such as *Ray* (Ray Charles), *Walk the Line* (Johnny Cash), *Dreamgirls* (a fictionalized version of Diana Ross and the Supremes), as well as more recent films like *Get on Up* (James Brown) and *Love & Mercy*

13

(California's Brian Wilson and The Beach Boys), introduced new generations of audiences to these pre-1972 artists. In television, pre-1972 sound recordings are frequently used to evoke an era and help tell a story. The music in the hit television series *Mad Men*, for example, documented the tumultuous 1960s through its "musical moments, covering everything from Chubby Checker to David Bowie." Amy Plitt, *25 Best "Mad Men" Musical Moments*, Rolling Stone, May 15, 2015, http://www.rollingstone.com/tv/lists/25-best-mad-men-musical-moments-20150515.

New generations of audiences have been introduced to pre-1972 recordings through their inclusion in movie or television soundtracks, and through other forms of popular media, such as video games. As an example, director Wes Anderson's popular film soundtracks "often highlight[] gems from the '60s and '70s." Jillian Mapes, *20 Old Songs Wes Anderson Gave New Life: A Playlist*, Flavorwire.com (Mar. 7, 2014), http://flavorwire.com/443888/20-old-songs-wes-anderson-gave-new-life-a-playlist. Sound recordings such as Nico's "These Days" (1967), David Bowie's "Life on Mars" (1971), and The Who's "A Quick One While He's Away" (1966), "were all hits to a certain generation of listeners, but through Anderson's films they became cultural touch-points for millennials as well." *Id.* The popular *Rock Band* series of video games exposed a generation of young "gamers" to such pre-1972 classics as California-based Creedence Clearwater Revival's "Fortunate

14

Son," The Who's "Baba O'Riley," and The Jimi Hendrix Experience's "Purple Haze." *See* Wikipedia, Complete List of Downloadable Songs for the *Rock Band* Series, https://en.wikipedia.org/wiki/Complete_list_of_downloadable_songs_for_the_Rock_Band_series (last visited Dec. 5, 2015).

Just last year, the soundtrack for the superheroes-in-space film *Guardians of the Galaxy* topped the Billboard Top 200 charts, and was the first No. 1 soundtrack in which the entire album was comprised of previously released sound recordings. *See* Keith Caulfield, *"Guardians of the Galaxy" Soundtrack Hits No. 1 On Billboard 200*, Billboard.com, Aug. 13, 2014, http://www.billboard.com/articles/columns/chart-beat/6214496/guardians-of-the-galaxy-soundtrack-no-1-billboard-200.[4] All of the sound recordings were originally released in the late 1960s and 1970s and contained such pre-1972 hits as Norman Greenbaum's "Spirit in the Sky" (1969), The Five Stairsteps' "O-O-H Child" (1970), The Jackson's 5's "I Want You Back" (1969), and Marvin Gaye & Tammi Terrell's "Ain't No Mountain High Enough" (1967).

These examples demonstrate that the universe of pre-1972 sound recordings is vast and contains many of the most popular and valuable recordings ever created

---

[4] *Guardians of the Galaxy* was a blockbuster movie, with a worldwide box office of nearly $775 million. http://www.boxofficemojo.com/movies/?id=marvel2014a.htm (last visited Dec. 4, 2015).

– recordings that remain as relevant and sought after today as ever. The district court's opinion protects the value of this treasure trove of popular music history.

We respectfully submit that, to reverse the district court and to not recognize a public performance right under California law with respect to these treasures, would be error. It should not be the case that a music service should have to pay for the right to transmit a recently popular and post-1972 "song of the Summer" recording, but not have to pay for the right to transmit the iconic recordings of The Beatles. Nor should it be the case that a music service should have to pay for The Rolling Stones' "Start Me Up" (1981), but not their "(I Can't Get No) Satisfaction" (1965). Neither is it easy to reconcile requiring payment for the digital transmission of the Four Tops' 1973 hit, "Ain't No Woman (Like the One I Got)," but not for the transmission of the same group's earlier 1960s hits like "Baby I Need Your Loving," "Sugar Pie Honey Bunch," or "Reach Out." Both fundamental fairness and logic compel the recognition of a public performance right for pre-1972 sound recordings under California statutory and common law.

## B. Pre-1972 Sound Recordings Continue To Maintain Great Cultural and Historical Significance.

The late 1950s through the early 1970s was a culturally explosive time in this country like no time thereafter, and the music of that era was the soundtrack of those times. The social and cultural issues that were at the fore then remain predominant today: race, gender equality, politics, poverty, war, sex, and drugs.

16

Music commented on, and in many ways led, the national discourse like no other media, and that music has withstood the test of time. Marvin Gaye's "What's Going On" (1971), for example, was one of the era's most plaintive expressions of concern about police brutality. Popular music included songs supporting civil rights (Sam Cooke's "A Change Is Gonna Come" (1964), and the Impressions' "People Get Ready" (1965), among others), opposing war (*e.g.*, Donovan's "Universal Soldier" (1964), Barry McGuire's "Eve of Destruction" (1965), and Black Sabbath's "War Pigs" (1970)), and proclaiming the importance of women's liberation and equal rights (*e.g.*, Aretha Franklin's "Respect" (1967) and Nancy Sinatra's "These Boots Are Made For Walking" (1966)). Artists such as Mahalia Jackson, Marian Anderson, Joan Baez, and Bob Dylan, among others, performed at the 1963 March on Washington, singing songs that are embodied in well-known pre-1972 sound recordings. *See Dream Songs: The Music of the March on Washington*, New Yorker, Aug. 28, 2013, http://www.newyorker.com/culture/culture-desk/dream-songs-the-music-of-the-march-on-washington.

The music of this era not only made music industry news; it made headline news. The Beatles appeared on the cover of Newsweek, which also referred to the opening riff of The Rolling Stones' "(I Can't Get No) Satisfaction" (1965) as "the five notes that shook the world." *See* Scott Mervis, *Rolling Stones Staple*

17

*"Satisfaction" Celebrates 50 Years*, Pittsburgh Post Gazette, June 18, 2015, http://www.post-gazette.com/ae/music/2015/06/18/The-Rolling-Stones-song-Satisfaction-at-50/stories/201506180015.

This now iconic music permeated popular culture. Countless artists appeared on The Ed Sullivan Show to perform their chart-topping hits, from Elvis Presley to The Beatles to Ella Fitzgerald, the Four Tops, Gladys Knight and the Pips, the Mamas & Papas, the Rascals, the Righteous Brothers, Jefferson Airplane, Simon & Garfunkel, The Rolling Stones, and many others. *See* The Official Ed Sullivan Site, All Artists, http://www.edsullivan.com/all-artists/ (last visited Dec. 4, 2015). The music of this period was diverse and innovative, and lives on in popular music today:

> Funk evolved from soul and into the main black genre of the 1970s; then birthed disco and coexisted with it before being absorbed by hip-hop. The funk/disco beat was the first modern beat, the earliest one that kids today can relate to and dance to, the main strand of hip-hop's DNA. In the early 1980s, samplers were invented, and … James Brown was the most sampled artist, his tracks becoming the foundations of countless rap tunes …. [I]t made him an icon … , the godfather of soul, funk, and hip-hop.

Andrew Grant Jackson, *1965: The Most Revolutionary Year in Music* 150 (2015). Pre-1972 sound recordings continue to play a significant role in our culture. Rights to these recordings are and should be protected in full by California law.

18

## CONCLUSION

Pre-1972 sound recordings are timeless and valuable. The owners of those recordings, the artists who created and performed on them, and those artists' families, deserve to be compensated when those recordings are exploited by others for profit. California law recognizes these fundamental property rights. The district court recognized those rights. So should this Court, which should affirm the district court's opinion insofar as it held that that Pandora did not have a likelihood of prevailing on the merits.

Respectfully submitted,

Dated: December 7, 2015

*/s/* Kenneth L. Doroshow

George M. Borkowski
RECORDING INDUSTRY
ASSOCIATION OF AMERICA, INC.
1025 F Street NW, Tenth Floor
Washington, DC 20004
Telephone: 202-775-0101
Fax: 202-775-7523

Kenneth L. Doroshow
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
Telephone: 202-639-6000
Fax: 202-639-6066

*Counsel for Amicus Curiae
Recording Industry Association of
America, Inc.*

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(5) and Circuit Rule 29-2(c)(2), I certify that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,071 words, exclusive of those parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

December 7, 2015

*/s/* Kenneth L. Doroshow
Kenneth L. Doroshow
*Attorney for the Recording Industry*
*Association of America*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Kenneth L. Doroshow
Kenneth L. Doroshow

*Counsel for Amicus Curiae*
*Recording Industry Association of*
*America, Inc.*